[No. 39117-8-I.    Division One.    September 14, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. STACEY A. KINCHEN, *Appellant*.

[31]RCW 26.26.140.

*Shannon B. Marsh* of *Washington Appellate Project*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Shannon D. Anderson, Deputy*, for respondent.

GROSSE, J. — Parents can be guilty of unlawful imprisonment of their own children in circumstances where the restrictions on the children's movements, viewed objectively, are excessive, immoderate, or unreasonable. Such a construction of the relevant statutes saves them from a constitutional challenge as applied to the circumstance of questionable parental discipline. Nonetheless, while Kinchen's challenge on this basis fails, we reverse his conviction because the record fails to demonstrate a unanimous verdict by the jury as to the circumstances for which Kinchen was criminally liable in the care of his two children.

Kinchen's two boys, ages eight and nine, are virtually uncontrollable, characterized as a disciplinary problem by their father, school officials, and their physician. They were often in trouble at school and had caused the family's eviction from an apartment complex, in which Stacey Kinchen had previously lived for seven-and-one-half years, for noise, destruction of property, throwing rocks, and other problems. After the eviction, Kinchen had the boys examined by a physician who made a diagnosis that they were suffering from Attention Deficit Disorder (ADD). The boys were put on the medication Ritalin.

In early July 1995, a maintenance man for the complex went to the Kinchen apartment to repair the oven door. Kinchen was not at home but the boys were in the apartment. The boys told the maintenance man they could not open the door because it was locked and they did not have a key. Instead, they told him to enter through a window. He did so and once inside he saw that the original lock on the door had been replaced and a deadbolt lock added. He also noticed padlocks on the refrigerator/freezer, as well as the kitchen cupboards, and a closet with sliding doors.

On the morning of July 11, 1995, the apartment housekeeper noticed two boys digging through the apartment complex's dumpsters located outside. She confronted them and they responded that they were hungry. When asked

why they did not eat at home, they replied that their father kept everything locked up. They said that before he went to work he gave them each a sandwich to eat for lunch, but they ate them right away. The housekeeper contacted the maintenance person who again crawled through the window of the Kinchen apartment. He noticed the same locked doors and cupboards. He said that without a key ingress and egress was limited to a window, although he admitted that this time he could open the sliding glass patio door. Police officers were called.

When the police officers arrived they found a spotless home, noting everything labeled and in place, including locked kitchen cabinets. The police officers also noticed that the lock on the bathroom door had been reversed so the button lock was on the outside. The boys told the police officers that their father locked them in the bathroom once while he was at work and that their attempt to get out was unsuccessful. They said their father left them with sandwiches to eat, and told them to call 911 in the event of an emergency. There were phones in the apartment, but not in the bathroom. The boys said they were threatened with bathroom "lock-up" when they were bad.

The boys said their father locked them inside the apartment without adult supervision on numerous occasions. They also testified that if they broke something or got into trouble, he would lock them in the bathroom for up to half a day while he went to work. The boys testified that Kinchen locked them in the apartment or the bathroom up to 10 times each.

The boys exhibited some confusion during the testimony, but were definite about being locked in the bathroom or the apartment. Most of their answers were one or two word answers or "yes, sir" or "no, sir" answers to leading questions, but they did testify they could get out of the apartment through the window, and that they exited the window often, usually when they were hungry. They testified that their father and the principal at school "whooped" them, and that their mother "whooped" them and hit them with a broom, allegations denied by all three adults.

Kinchen testified that after moving into the apartment complex there were several days when the boys would sneak a significant quantity of the food he had left in the apartment, especially cookies and other sugar treats. He said the boys would eat these all at once, mostly at inappropriate times between meals. As a result, he placed locks on the kitchen cabinets and the refrigerator. He also testified that he placed security locks on the apartment door that locked from either the inside or outside, and that he provided his sons with keys to the door so they could get in and out. These keys were on strings to be worn around their necks. There were also spare keys to the front door which were on the door to his office in the apartment. Kinchen also explained that after he caught the boys "playing with each other" the bathroom lock was reversed so the boys could no longer lock themselves in the bathroom.

Kinchen testified regarding the trouble the boys had in school which included fighting, stealing, cursing, and taking a water gun to school resulting in numerous suspensions. He said the boys spray painted the television screen so he restricted their viewing, and he disconnected it and the VCR during the day. He testified regarding his purchase of the extra locks and keys and produced receipts from a Renton key shop dated in early June. Kinchen spent a long time recounting the boys' behavior and his discipline of them. He denied ever physically abusing or assaulting them.

There was also testimony from Kinchen's girl friend that she and her children spent the night at the Kinchen apartment on July 10, 1995. She testified that on the morning of July 11, she and her children left because she thought the boys were not around. She locked the apartment using a spare key on a string she retrieved from the office in the apartment. She returned to the apartment once Kinchen telephoned to inform her the boys were still at the apartment, but by the time she arrived the boys were gone, taken by police officers to Child Protective Services (CPS).

Kinchen's sister testified that either she or one of her

baby-sitters often took care of the boys while Kinchen was working. Kinchen's 10-year-old niece testified that the boys would be at her house often and that the two families would fix dinner together at each other's house or would go out to eat at restaurants many times a week. She did state that the boys would be left alone on occasion.

There was testimony from a neighbor about two young boys who came to her apartment and asked for food. She let them in and fed them cereal. She tried to establish which apartment they lived in so she could look for the boys' parents, but she was unsuccessful by the time the boys finished eating and left. She did discover these were the same two boys found scrounging in the dumpster later that day.

The maintenance man testified that the boys were very happy to see him when he entered the apartment to fix the oven door. He stated they wanted to play the radio and told him they could not watch television but they could play the radio. The maintenance man testified that on July 11, the day that the police officers came, the sliding glass door into the apartment was open, not locked or chained, although he had again entered the apartment through the window.

Dr. Oldham, board certified and a Harvard Medical School graduate, testified that he diagnosed the boys with ADD in September of 1994 and said he had been their primary physician since July of 1992. He discussed letters contained in their file from school officials about the boys' behavior at school: being unfocused, crawling on the floor, tipping over the desks, hitting or punching other kids, tearing up papers. He testified that in the years he had seen the children he never suspected any kind of abuse. If he had, he indicated he would have made a CPS referral.

Initially the State charged Kinchen with one count of unlawful imprisonment. At trial, the State was allowed to amend the information to bifurcate the count as to each son and add two assault charges based on each of the boy's allegations. During deliberation, the jury sent a note to the court inquiring about definitions of "legal authority" and

"unlawful and lawful authority." The jury made a request for the trial court to explain the differences between the terms. The court responded that instruction 6 explained under what circumstances parental discipline of a child is with "legal" or "lawful" authority.[1]

The jury found Kinchen guilty of both counts of unlawfully imprisoning his children contrary to RCW 9A.40.040, but acquitted him of the assault charges. He was given a standard range sentence of 90 days. Considering time served and good time, he was released. He was ordered to take parenting classes and have no contact with his sons for five years, unless the order was modified by CPS. Kinchen appeals.

## DISCUSSION

Kinchen was convicted of unlawfully imprisoning his sons contrary to RCW 9A.40.040(1) which states:

> A person is guilty of unlawful imprisonment if he knowingly restrains another person.

"Restrain" is defined in RCW 9A.40.010(1) as:

> "Restrain" means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty. Restraint is "without

---

[1]Instruction 6 provided:

A person commits the crime of unlawful imprisonment when he knowingly restrains another person.

To restrain means to restrict another person's movements without consent and without legal authority in a manner which interferes substantially with that person's liberty. Restraint is without consent if it is accomplished by physical force or intimidation.

A substantial interference with another's liberty occurs when, considering the context of the event, a real or material interference occurs as opposed to a slight inconvenience or petty annoyance.

When done by a parent for purposes of restraining or correcting a child, physical discipline of a child is with lawful authority when it is reasonable and moderate.

consent" if it is accomplished by (a) physical force, intimidation, or deception, or (b) any means including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and if the parent, guardian, or other person or institution having lawful control or custody of him has not acquiesced.

Kinchen challenges his conviction asserting that the unlawful imprisonment statute is void for vagueness as applied to him under the facts in this case because he is a parent who acted with legal authority in disciplining his children.

█ The Fourteenth Amendment due process clause requires fair warning of proscribed conduct.[2] A statute is void for vagueness if its terms are " 'so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application,' "[3] or if it "does not provide ascertainable standards of guilt to protect against arbitrary enforcement."[4]

Kinchen's appeal focuses on the phrase "lawful authority" and the phrase used in the statute, "without legal authority." Analogizing to cases in which the Supreme Court has deemed statutes and ordinances to be unconstitutionally vague, while containing phrases such as "lawful order," "without lawful purpose," and "without lawful excuse," Kinchen contends that these words leave the scope of the statutory proscriptions uncertain, especially when coupled with the fact that he, as a parent, has the right to restrict the movements of his children or to punish them. Kinchen argues that the statute allows police officers, prosecutors, and juries to enforce the statute in a subjective manner. We must disagree.

---

[2]In the absence of a state constitutional analysis as described in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), this court decides the vagueness issue under federal constitutional law. *See City of Spokane v. Douglass*, 115 Wn.2d 171, 176-77, 795 P.2d 693 (1990).

[3]*State v. Worrell*, 111 Wn.2d 537, 540, 761 P.2d 56 (1988) (citing *Myrick v. Board of Pierce County Comm'rs*, 102 Wn.2d 698, 707, 677 P.2d 140, 687 P.2d 1152 (1984)); *see also State v. Smith*, 111 Wn.2d 1, 7, 759 P.2d 372 (1988).

[4]*Douglass*, 115 Wn.2d at 178.

450

Our State Supreme Court has denied facial challenges to the phrase "without legal authority" as it pertains to the kidnapping statute[5] and the harassment statute.[6] The court in *State v. Worrell* found the phrase was not vague because persons of ordinary intelligence are able to read the definition of "restrain" and determine what types of activity are being proscribed.[7] Additionally, the court found that persons could resort to cases interpreting the statute if they needed further guidance.

Kinchen claims the restraint of his children could not be "without legal authority," given his rights as a parent.[8] There is no question that a parent has a right to parent without the State's interference with child-rearing practices, including reasonable discipline not proved to be injurious to the child's health, welfare, and safety. In fact a parent may impose *reasonable* corporal punishment.[9] Further, courts have held that a parent may restrict or exclude children from portions of a house, that the children are not entitled to "free reign" or an absolute privilege of use of the entire home.[10] A standard of reasonableness or moderateness has been applied in this state to actions of a parent.[11]

■■ The prevalent approach is to determine " 'whether, in light of all the circumstances, the [parental] conduct

---

[5]*Worrell*, 111 Wn.2d at 543-44.

[6]*State v. Smith*, 111 Wn.2d 1, 11-12, 759 P.2d 372 (1988).

[7]111 Wn.2d 537, 543-44, 761 P.2d 56 (1988).

[8]Under common law, a parent could generally take liberties and do what he or she thought was best for the child. Under the guidelines of more modern statutes and case law, the focus is on the welfare of the child and not on the parent's liberty of action. *See* 59 Am. Jur. 2d *Parent and Child* § 24 (1971); *see also* RCW 9A.16.100.

[9]*See* RCW 26.44.010; *State v. Singleton*, 41 Wn. App. 721, 723, 705 P.2d 825 (1985).

[10]*See State v. Crist*, 80 Wn. App. 511, 515, 909 P.2d 1341 (1996).

[11]A parent may be permitted to intentionally touch or strike a child and such action may not be unlawful unless the force used to commit the battery was unreasonable or immoderate under RCW 9A.16.100. *See State v. Russell*, 69 Wn. App. 237, 246 n.4, 848 P.2d 743 (1993).

itself, *viewed objectively*, would be considered excessive, immoderate, or unreasonable.' "[12] As in other circumstances, persons of ordinary intelligence are able to read the statutory definition of "restrain" (RCW 9A.40.010(1)) and determine what types of activity are being proscribed. Here, the jury was instructed in the fourth paragraph of instruction 6, "When done by a parent for purposes of restraining or correcting a child, physical discipline of a child is with lawful authority when it is reasonable and moderate." Kinchen's argument that the statute fails to provide notice to parents or citizens of proscribed conduct is not convincing. The statute is not unconstitutionally vague as applied here.

■ "Criminal defendants in Washington have a right to a unanimous jury verdict."[13] In most situations, "the right to a unanimous jury trial also includes the right to express jury unanimity on the *means* by which the defendant is found to have committed the crime."[14] The test is whether sufficient evidence exists to support each of the alternative means presented to the jury. If the evidence is insufficient to support any one of the means submitted to the jury, the conviction will be reversed.[15] In this case, the State argued that Kinchen should be found guilty based on locking his children in the bathroom *or* by his actions of keeping them in the apartment.

The State claims that the facts mandate a conviction even if there was no evidence that Kinchen locked the boys in the bathroom for periods of time while he was at work. We disagree. The evidence of locking them in the bathroom for some hours without supervision is the only evidence sufficient to support the conviction. Contrary to the State's argument, while generally left in the apartment, the boys

---

[12]*Singleton*, 41 Wn. App. at 723 (citations omitted).

[13]*State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994) (citing CONST. art. I, § 21).

[14]*Id.* at 707 (citations omitted).

[15]*State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980).

could and did get out. Additionally, they had access to and used the phone to call their aunt and 911 in the event of an emergency. Although they were not given access to the refrigerator or to the cabinets containing food, they were given food to eat while their father was not at home and they had access to the bathroom and to a water supply. There was evidence that the boys were provided with keys which they lost, they went in and out a window in any event, and the sliding glass door was unlocked some of the time. We believe there is insufficient evidence to support the State's argument that the boys were unlawfully restrained from leaving or imprisoned in the apartment on those occasions when they were left alone there.[16]

Because there was no special verdict form, we do not know which of the alleged acts provided the basis for the jury's verdict, the act of locking the boys in the bathroom or the act of leaving them alone in the apartment. Because there is insufficient evidence to support a conviction by this second means, the case must be reversed and remanded for retrial.

Kinchen also claims the trial court abused its discretion in admitting 31 photographs of the kitchen in the apartment. We agree. Kinchen objected to the admission of numerous photographs of his apartment as irrelevant and prejudicial. The 31 photographs showed all of the rooms of the apartment, but were predominantly of several padlocked kitchen cabinets, the refrigerator, and the kitchen counter.

▪ To be admissible, evidence must be relevant. Relevant evidence is defined in ER 401 as "evidence having any tendency to make the existence of any fact that is of conse-

---

[16]We recognize, however, the fact that the boys could escape from the apartment does not automatically preclude prosecution for unlawful imprisonment. But for the State to succeed on this theory, the known means of escape must present a danger or more than a mere inconvenience. *Accord Chicarelli v. Plymouth Garden Apartments*, 551 F. Supp. 532, 541 (E.D. Pa. 1982) (citing RESTATEMENT (SECOND) OF TORTS § 36, cmt. a (1965)). On the specific facts of this case, the mere locking of the boys in the apartment was insufficient to constitute unlawful imprisonment. The window and the sliding glass door presented a reasonable and readily accessible means of escape.

quence to the determination of the action more probable or less probable[.]" To be relevant the evidence must have probative value and be material to the case.[17]

■ ■ Here, even the trial court indicated that the pictures were not relevant in the sense that they did not inform on the basis for the charge, stating that they were not relevant to determining whether or not the felony of unlawful imprisonment occurred. The trial court indicated it admitted the pictures to show the surrounding circumstances of the children in their day-to-day living arrangement. However, there were 31 photographs admitted. After review of those photos, we find that three or four of them may have been relevant to the issues: (1) the reversed lock on the bathroom door; (2) the chain on the sliding glass door; (3) the view of the bathroom; and (4) the key-entry deadbolt on the front door. A review of the questioning and argument of the prosecutor that Kinchen created a jail or dungeon out of his apartment with locks on everything, including cupboards containing the food, indicates these pictures could have been extremely inflammatory and that they were central to the State's irrelevant and underlying argument that Kinchen was a bad father so the jury should convict him. The admission of the pictures placed Kinchen on trial for offenses for which he was not charged. The pictures were calculated to inflame the jurors rather than persuade them.

The prejudicial effect of the photographs substantially outweighed the probative value to assist the jury in determining Kinchen's guilt or innocence on the charge of unlawful imprisonment. The admission of these photographs was erroneous. Because we are remanding for a new trial, there is no need to determine if the error was harmless.

The conviction is reversed and the case remanded.

---

[17]*State v. Rice*, 48 Wn. App. 7, 12, 737 P.2d 726 (1987).

COLEMAN and BAKER, JJ., concur.