IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76424-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CLEVE GOHEEN-RENGO, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: September 24, 2018 |

ANDRUS, J. — A jury convicted Cleve Goheen-Rengo of unlawfully imprisoning two Washington State Department of Children, Youth, and Families[1] (Department) social workers at the conclusion of a supervised visit with Goheen-Rengo's children. Goheen-Rengo appeals, contending the State presented insufficient evidence to prove he substantially interfered with the social workers' liberty. He also challenges the trial court's rulings on the admissibility of evidence of his prior misconduct toward the social workers and the propriety of statements the prosecutor made in closing argument. We affirm.

---

[1] At the time of the incident and when the matter was tried, the entity was known as the Department of Social and Health Services Children's Administration. See LAWS OF 2017, 3d Spec. Sess., ch. 6 (creating Department of Children, Youth, and Families).

FACTS

In late 2014, the Department filed a dependency petition involving Goheen-Rengo's family. Goheen-Rengo's three young children, a two-year-old son and 21-month-old twins, remained in Department custody in June 2016.

Following the incident on June 10, 2016, Goheen-Rengo was charged with two counts of unlawful imprisonment in violation of RCW 9A.40.040. The affidavit of probable cause alleged that Goheen-Rengo had a history of cursing, swearing at, and demeaning social workers assigned to his family's case. There was also an indication in Goheen-Rengo's trial brief that he had a history of domestic violence involving the children's mother, had previously stalked and harassed the children's foster families, had failed to comply with court orders entered in the dependency case, and had previously threatened Department social workers.

At trial, Department social workers Angela Paull and Emilie Regan testified that because of safety concerns with Goheen-Rengo, the Department imposed rules for his visits, including requiring that two or more social workers supervise each visit and that visits be held at the Whatcom County Courthouse, where Goheen-Rengo had to go through a security screening. The Department social workers testified that these safety precautions were atypical, even for supervised visits, and that they reflected the serious safety concerns the social workers and the Department had in this case.

Paull and Regan also testified there were other limitations placed on Goheen-Rengo's visits, the majority of which were court ordered. First, Goheen-Rengo could not talk to the children about coming back home or make negative

statements about the social workers. Additionally, he was not allowed to bring a camera or cell phone, and he could not bring junk food for the children. Lastly, he had to stay at the visit location for at least 15 minutes after the social workers and children left the visit location.

On June 10, 2016, Goheen-Rengo attended a scheduled visit with his children on the second floor of the courthouse, where he was supervised by Paull and Regan. Both Paull and Regan testified that this visit did not go well. Paull testified that during the visit, Goheen-Rengo glared at her, postured toward her, and verbally intimidated her. Regan described Goheen-Rengo's demeanor as combative, defensive, argumentative, and mean. Paull stated she was afraid, nervous, and scared of Goheen-Rengo during the visit. Likewise, Regan testified that she never really knew what to expect from the father and was uneasy when he arrived for the June 10 visit.

Throughout the visit, Paull intervened to prevent Goheen-Rengo from engaging in unsafe behavior with the children. For example, Paull and Regan each testified that Goheen-Rengo gave his children small items to play with that presented choking hazards. Additionally, Goheen-Rengo refused to follow the social workers' instructions for properly feeding the twins, both of whom had feeding problems that required them to sit upright while eating to avoid choking. Paull had to remind Goheen-Rengo several times that the children could only be bottle fed while seated upright. Those reminders enraged Goheen-Rengo, and he accused the social workers of treating his children like dogs and argued that Paull was not a parent and did not know what his children needed.

Paull testified that after those remarks, she warned Goheen-Rengo that if he spoke to her again in that manner, she and Regan would end the visit. Shortly thereafter, one of the children said something about an upcoming birthday, and according to Paull, Goheen-Rengo said they would celebrate birthdays when "they were altogether again as a family." Because this comment violated the rule against talking about the children returning home, and Paull had given repeated warnings to Goheen-Rengo about his other misconduct, she ended the visit before its scheduled time.

When Paull ended the visit early, Goheen-Rengo became angry, called Paull a bitch, and began ranting that she was dammed and would go to hell and that she would be judged for tearing apart his family. Regan confirmed Goheen-Rengo's verbal abuse toward Paull. As he began to escalate, Paull and Regan carried the children to the courthouse elevators and Goheen-Rengo followed.

When Paull and Regan entered the elevator with the children, Goheen-Rengo deliberately put his foot between the elevator doors to prevent them from closing, and he stood in the middle of the entrance so that no one could get out of the car. Paull testified that there was no way she could safely get around him to exit the elevator. Regan concurred. Both Paull and Regan testified that Goheen-Rengo said he would not let them leave until the children smiled at him. Regan had previously handled difficult parents in her role with the Department, but she testified that this situation was unique because they were trapped and had nowhere to go and no way to get out.

Paull testified that she repeatedly asked Goheen-Rengo to move his foot and to let them leave, but Goheen-Rengo refused to move even when the elevator's alarm began to sound because the doors had been open too long. When Paull pulled out her cell phone and threatened to call courthouse security, Goheen-Rengo finally stepped back, let the doors close, and told Paull "this isn't over." Both social workers left the courthouse, trembling and terrified by Goheen-Rengo's aggression toward them.

During his testimony, Goheen-Rengo gave a very different account of events. He denied talking about reunification with the children; he claimed that before Paull ended the visit, he merely told his children they would be back home soon, which could have meant back home with their foster family. He did not remember telling Paull that she was damned and going to hell for breaking up his family. He testified that he carried the twins to the elevator, kept the elevator open with his foot to let the social workers enter, and then handed off the twins to Paull and Regan. At that point, he said he was going to let the elevator go, but he saw that his children looked afraid, and he did not want the visit to end that way. Goheen-Rengo admitted he told the social workers he would hold the elevator doors open until the children smiled. He stated that he made that comment to alert the social workers as to why he was keeping the elevator doors open and that he was not there to "punch them or threaten them or to make them fearful or to call them bitches, or to tell them they're going to hell, or to get in their head, or to intimidate them." He claimed his overall goal was to make sure his children did not look scared before they left.

Before trial, the parties discussed the extent to which the social workers could testify about prior allegations of misconduct by Goheen-Rengo during other visits with the children or when interacting with the social workers. The prosecutor asked to let the social workers speak about the fear they felt during the June 2016 visit to overcome Goheen-Rengo's contention that any infringement on their liberty was a mere inconvenience. The prosecutor indicated there was no need to elicit testimony from the social workers about any of the prior threats or prior instances where they felt afraid of Goheen-Rengo, but wanted to have them testify that they had history with him and that based on that history, they felt uncomfortable that day. The prosecutor also asked to let the social workers explain why the visits were supervised by two social workers and held in the courthouse and why those precautions were irregular.

Goheen-Rengo agreed that the social workers were probably entitled to testify about their observations and feelings that day, but he wanted assurance that the witnesses would not testify about allegations of prior threats. The prosecutor agreed to not elicit such testimony.

The trial court ruled that the social workers were permitted to testify about the reasons for being in the building with Goheen-Rengo, the purpose of the meeting, including that there was a case involving his children, and the reasons for ending the visit early. The trial court also ruled that the social workers could say that they were supervising the visits with the children, that two people were present during each visit after of difficulties during previous visits, and that Goheen-Rengo had failed to comply with court orders regarding those visits. The

trial court expressly allowed witnesses to testify that the visitation occurred at the courthouse because the social workers believed it was a safer place and that they felt fear in the situation at the time of the incident at the elevator on June 10, 2016. The trial court excluded any evidence of prior threats that Goheen-Rengo may have made to the social workers. Later, the trial court clarified it was barring testimony as to any prior threats, alleged assaults, or stalking.

The jury found Goheen-Rengo guilty of unlawfully imprisoning both Paull and Regan. The trial court sentenced him to a combined six months total confinement for both counts. Goheen-Rengo appeals.

## ANALYSIS

Goheen-Rengo raises three issues on appeal. First, he contends the State presented insufficient evidence to prove beyond a reasonable doubt that he substantially interfered with the social workers' liberty. Second, he claims the trial court abused its discretion when it admitted prejudicial evidence of other acts of his misconduct. Finally, he argues the prosecutor engaged in misconduct requiring reversal of his convictions.

A. Unlawful Imprisonment

Goheen-Rengo maintains that merely stopping elevator doors from closing is insufficient to prove unlawful imprisonment, that the social workers were not restrained because they could have walked out of the elevator, and that neither social worker asked for assistance from law enforcement while at the courthouse, suggesting his conduct was no more than an annoying inconvenience. We disagree.

Unlawful imprisonment requires knowingly restraining another person. RCW 9A.40.040. A person is restrained if his or her movements are restricted "without consent and without legal authority in a manner which interferes substantially with his or her liberty." RCW 9A.40.010(6); see also State v. Warfield, 103 Wn. App. 152, 157, 5 P.3d 1280 (2000). Physical force, intimidation, or deception are all considered "without consent." RCW 9A.40.010(6). This Court has defined a substantial interference with a person's liberty to "mean a real or material interference with the liberty of another as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict." State v. Robinson, 20 Wn. App. 882, 884, 582 P.2d 580 (1978) (internal quotation marks omitted). Words alone can be sufficient to establish intimidation and restraint. See State v. Lansdowne, 111 Wn. App. 882, 889, 46 P.3d 836 (2002).

The State must prove all elements of the charged crime beyond a reasonable doubt. State v. Washington, 135 Wn. App. 42, 48, 143 P.3d 606 (2006). When, as here, the sufficiency of the evidence is challenged, this Court views the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. All reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. Id. at 48-49.

Goheen-Rengo contends that holding the elevator door open was a courtesy rather than an unlawful act sufficient to establish substantial interference with the social workers' liberty. He relies on several cases, both unpublished and

published, to argue that his conduct does not rise to the level of unlawful imprisonment. See State v. Flores, No. 44952-8-II (Wash. Ct. App. Mar. 24, 2015) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2044952-8-II%20%20Unpublished%20Opinion.pdf (employees and customers of credit union were unlawfully imprisoned when Flores held a gun while dragging his estranged wife out of the building); Washington, 135 Wn. App. at 50-51 (victim was unlawfully imprisoned when ordered into a car and assaulted after trying to leave); State v. Davis, 133 Wn. App. 415, 424-25, 138 P.3d 132 (2006) (child unlawfully imprisoned after investigating mother's assault, being pulled to the ground by assaulter, and told not to leave the apartment), vacated, State v. Davis, 163 Wn.2d 606, 184 P.3d 639 (2008) (remanded for resentencing)).

These cases are, of course, factually distinguishable from Goheen-Rengo's case because the defendant in each case engaged in serious, violent behavior before, during, and after the unlawful imprisonment. The cases, however, do not support Goheen-Rengo's contention that his conduct was "merely courteous." Nor do they lead to the inevitable conclusion that his behavior did not rise to the level of unlawful imprisonment.

At trial, the State presented testimony that Goheen-Rengo knowingly restrained the Department social workers without their consent. The State argued that Goheen-Rengo stopped the elevator doors from closing with his foot—physical force—and stood in the doorway while Paull repeatedly asked him to let them leave. It also presented evidence that Goheen-Rengo insisted he would not let the doors close until he saw his children smile, while at the same time engaging

in such verbally aggressive behavior that the social workers could not see how the children could meet their father's unreasonable demands. The State also presented the testimony of Paull and Regan, who said that even though the episode at the elevators lasted only a few minutes, they were both terrified during and after the incident. Sergeant Claudia Murphy with the Bellingham Police Department, and a direct liaison with social workers at the Department, testified that the incident impacted the social workers very negatively, and that they still expressed fear several days later when they reported the incident to her. Viewed in the light most favorable to the State, a reasonable juror could conclude that Goheen-Rengo's actions substantially interfered with Paull's and Regan's liberty.

Goheen-Rengo maintains that the social workers could have simply walked out of the elevator and, therefore, possessed the keys to their own release. He relies on State v. Kinchen, in which this Court concluded the defendant's children were not unlawfully imprisoned, despite being locked alone in an apartment, because they were given keys to the apartment, which they lost, but often exited through an unlocked sliding door or window when they were hungry. 92 Wn. App. 442, 452, 963 P.2d 928 (1998). But, a known means of escape is not viable if it presents a danger. See id. at 452 n.16. Both Paull and Regan testified they did not feel they could exit the elevator with Goheen-Rengo standing there. They said they would have had to physically shove or push him to get past him and neither woman felt like she could do so safely. Based on the social workers' testimony, trying to leave the elevator with three young children while Goheen-Rengo stood in their way presented more than a mere inconvenience. Interpreting the

inferences most strongly against Goheen-Rengo, we conclude that a reasonable juror could find the fear and intimidation Goheen-Rengo caused the social workers to experience, along with his physical presence blocking the elevator doorway, foreclosed any means of escaping the elevator.

Goheen-Rengo also argues the social workers' behavior contradicts their testimony because had they been truly terrified by the incident, they would have immediately called the police or stopped on the first floor of the courthouse and reported the incident to the security officers. But the jury had the opportunity to assess the social workers' credibility, as well as that of Goheen-Rengo himself. Credibility determinations are for the trier of fact and are not subject to review. State v. Cantu, 156 Wn. 2d 819, 831, 132 P.3d 725 (2006). We will not set aside the trier of fact's credibility determination and must defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Andy, 182 Wn.2d 294, 303, 340 P.3d 840 (2014).

Paull testified that Goheen-Rengo's behavior was so unpredictable that she and Regan left the courthouse as soon as they got to the first floor, rather than stop to report the incident to courthouse security because she was still scared for her safety and the safety of her co-worker and the children. Paull also testified that when they reached the first floor, Goheen-Rengo stood at a second floor railing overlooking the first floor entrance, yelling at them that Paull would be judged and damned. Goheen-Rengo denied this verbal aggression. The jury clearly found the social workers to be more credible than Goheen-Rengo and resolved the conflicting testimony at trial against him. We conclude the State

presented sufficient evidence to prove beyond a reasonable doubt that Goheen-Rengo unlawfully imprisoned Paull and Regan.

## B. Evidence of Prior Acts

Goheen-Rengo argues the trial court improperly admitted prejudicial evidence of his past conduct during the trial, contrary to its pretrial rulings. He specifically argues that the social workers referred to prior threats Goheen-Rengo made toward them and that the admission of this evidence violated ER 404(b).

First, we disagree with Goheen-Rengo's assertion that there were "repeated" references to inadmissible evidence or that Goheen-Rengo "objected to the repeated violations." The trial court excluded evidence of any prior threats or assaults against social workers. It permitted testimony that a dependency case was in progress, that Goheen-Rengo had previously failed to comply with visitation rules and court orders, and as a result, the Department had two social workers at each visit to ensure visits went appropriately. Goheen-Rengo objects to Paull's testimony that the visits were held at the courthouse because the Department did not feel any other location would be a safe place for visits to occur with Goheen-Rengo and that Goheen-Rengo directed negative comments toward her personally at the courthouse—conduct that "triggered an alarm bell" in her head. He also objects to Paull's testimony that her protocol was to report incidents involving Goheen-Rengo to her supervisor because "it had happened a number of times." Finally, he objects to Regan's testimony that the visits were held at the courthouse because they had "exhausted all of [their] other options for safety reasons."

Defense counsel objected to Regan's testimony at trial:

> [I]n Ms. Regan's testimony, she made reference to things in the past, threats that were made, safety of the children, and I think that goes directly to the 404(b) argument that we had pretrial of evidence that was to be excluded, testimony that was not to be made.
>
> I would ask that you instruct the jury to disregard that comment, to not take it into consideration during their deliberations, and that you advise the witness not to go into that kind of issue.

The State did not object to the request for a curative instruction. The trial court stated that although it thought the testimony was historical and that Regan had not mentioned any specific incidents, it agreed to give the jury a limiting instruction. Before Goheen-Rengo's counsel cross-examined Regan, the trial court instructed the jury:

> Members of the jury, before [Goheen-Rengo's counsel] begins her cross-examination, I just note that during Ms. Regan's testimony, you may have heard statements regarding events in the past prior to the date of this incident that's before the court in June 10th of 2016 involving Mr. Goheen-Rengo.
>
> You are to disregard any such testimony and not consider it at all in your deliberations.

Jurors are presumed to follow the court's curative instructions. State v. Kalebaugh, 183 Wn.2d 578, 586, 355 P.3d 253 (2015). The trial court's act of striking testimony from Regan regarding any past incidents eliminated any possible error that may have occurred.

Goheen-Rengo did not object to any of the testimony provided by Paull. In a situation where a party prevails on a motion in limine to restrict certain evidence and thereafter suspects a violation of that ruling during trial, the party has a duty to bring the violation to the attention of the court and allow the court to decide what

remedy, if any, to direct. State v. Sullivan, 69 Wn. App. 167, 171-72, 847 P.2d 953 (1993). By failing to object to Paull's testimony as a potential violation of an in limine order, Goheen-Rengo waived review of the trial court's failure to act on any alleged violation of the order in limine.

Second, the trial court did not err in allowing limited evidence that the visits were scheduled at the courthouse due to safety concerns. The State is entitled to present its case so that it can satisfy its burden of proving every essential element of a crime beyond a reasonable doubt. State v. Ashley, 186 Wn.2d 32, 43 n.4, 375 P.3d 673 (2016). Although evidence may not be admitted to prove a person's propensity to commit the crime charged, State v. Fisher, 165 Wn.2d 727, 744, 202 P.3d 937 (2009), that same evidence may be admissible for another purpose, such as to show a defendant's motive or intent, State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). When the trial court has correctly interpreted the rule, as it did here, we review the admission of evidence under an abuse of discretion standard.

To prove unlawful imprisonment, the State must prove that a defendant restrained the movements of a person, and that this restraint was either without the person's consent or "accomplished by physical force, intimidation, or deception." RCW 9A.40.010(6). Evidence of Goheen-Rengo's involvement in a child welfare investigation, the removal of his children, his prior unwillingness to follow court orders or Department rules for visits with the children, his repeated expressions of distrust of "the system," and his animosity toward social workers are relevant to his motive for attempting to prevent the social workers from leaving

the courthouse that day or his intent to restrain their movements through intimidation.

Evidence may also be admissible as "res gestae" evidence to complete the story of the crime by providing context of the circumstances surrounding the crime. State v. Tharp, 27 Wn. App. 198, 204, 616 P.2d 693 (1980), aff'd, 96 Wn.2d 591, 637 P.2d (1981). The trial court reasoned that the jury would need to understand why the social workers were present in a courthouse with Goheen-Rengo's children and why they imposed rules on his conduct during the visit with his children in order to understand the context of the parties' interaction that day. The decision to admit this limited evidence is reasonable; it was relevant to explain the hostility and verbal aggression Goheen-Rengo demonstrated toward the Department social workers on the day in question and how that impacted the social workers' actions when he confronted them in the elevator. See Ashley, 186 Wn.2d at 45 (evidence of prior antagonistic relationship between defendant and victim is relevant to assess victim's state of mind—whether she was restrained against her will because she was intimidated). We conclude that the trial court did not abuse its discretion in admitting the social workers' testimony.

C. Prosecutorial Misconduct

Lastly, Goheen-Rengo asserts that the prosecutor committed misconduct during closing argument and denied him his constitutional right to a fair trial. Specifically, he argues that the prosecutor improperly mentioned Goheen-Rengo's prior misconduct and employed the forbidden "golden rule" argument. Neither argument is persuasive.

Goheen-Rengo bears the burden of proving the prosecutor's conduct was improper. State v. Pierce, 169 Wn. App. 533, 552, 280 P.3d 1158 (2012). In addition, he must show the improper conduct had a substantial likelihood of affecting the verdict. Id. However, because Goheen-Rengo failed to object to the purportedly improper comments at trial, he must also establish that the comments were so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). If the argument has an inflammatory effect on the jury, it is unlikely that it could have been cured by a jury instruction. Id. at 763. This Court reviews the purportedly improper remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury. Id.

Goheen-Rengo cites to one instance in which the prosecutor referred to Goheen-Rengo's past acts during closing argument. Specifically, the prosecutor reminded the jurors they had heard issues about how Goheen-Rengo had acted out in the past, and argued that Paull and Regan had testified to their reasons for fearing Goheen-Rengo. This argument was made in the context of the special rules governing Goheen-Rengo's visits, which he violated, that were meant to ensure the safety of his children and that visits went well. Those were all areas in which the trial court ruled that evidence of past misconduct would be admissible. Thus, this statement was not improper.

Next, Goheen-Rengo argues the prosecutor improperly used the golden rule argument when he argued that the jurors could put themselves in the social

workers' shoes and asked "How might you feel after this event?" Because Goheen-Rengo did not object to this argument at trial, we must determine if the statements were inflammatory.

A golden rule argument evokes the biblical phrase to "do unto others as you would have them do unto you" and asks jurors to give a party the recovery she would wish if she were in the same position as the party. Adkins v. Aluminum Co. of Am., 110 Wn.2d 128, 139, 750 P.2d 1257 (1988). A golden rule argument is barred in civil cases because it "encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Id. (quoting Rojas v. Richardson, 703 F.2d 186, 191 (5th Cir. 1983)). In State v. Borboa, the Washington State Supreme Court stated it was not convinced that the prohibition on golden rule arguments applies in the criminal context. 157 Wn.2d 108, 124 n.5, 135 P.3d 469 (2006).

Even if the rule is extended to criminal cases, Goheen-Rengo must still demonstrate that the statement was both flagrant and ill-intentioned. Goheen-Rengo compares the prosecutor's argument in this case to that employed by the prosecutor in State v. Pierce. We find Pierce distinguishable. There, the prosecutor asserted facts not in evidence by attributing repugnant and amoral thoughts to the defendant—thoughts based solely on the prosecutor's speculation as to what the defendant was thinking as he committed brutal murders. Pierce, 169 Wn. App. at 553-54. The prosecutor also fabricated a heart-wrenching and inflammatory account as to how the murders occurred. Id. at 554. Finally, the prosecutor analogized the jurors' oath to an oath of marriage or an oath not to

overthrow the government, implying that a failure to convict the defendant was akin to adultery or treason. Id. at 557. Even though Pierce did not object to any of those statements at trial, this Court had little difficulty concluding that Pierce had established that the remarks in their totality caused incurable prejudice. Id. at 556. These remarks, combined with other highly inflammatory arguments, "engendered an incurable prejudice in the minds of the jury." Id.

In this case, Goheen-Rengo points to a single golden rule type statement made in closing. Although a prosecutor should not ask jurors to put themselves in a victim's shoes, there is no contention that the prosecutor fabricated a story as to how the crimes occurred or that the prosecutor referred to evidence outside the record. Nor was there any suggestion to the jury that they were legally bound by their oath to convict. Therefore, any impropriety in asking the jurors to put themselves in the social workers' shoes was not so flagrant and ill-intentioned as to be immune to a curative instruction.

We affirm.

WE CONCUR: