IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38497-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EDUARD Y. CHUMOV, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Eduard Chumov was convicted of second degree assault by strangulation and unlawful imprisonment committed against an intimate partner. On appeal, he renews an argument he made at the close of the State's case: that insufficient evidence supports the unlawful imprisonment charge, because the victim could have escaped through the front door.

Although a known means of escape can be a defense to unlawful imprisonment, it does not avail Mr. Chumov in this case. We affirm.

FACTS AND PROCEDURAL BACKGROUND

On an evening in late February 2021, Alyssa Cazeau arrived home to an apartment she was sharing with Eduard Chumov, her intimate partner at the time. The couple's relationship had been rocky for a few days, and they immediately began arguing upon

Ms. Cazeau's arrival. Ms. Cazeau had been visiting her sister and decided it would be best if she returned to her sister's house for the evening.

Before she left, Mr. Chumov asked if he could use Ms. Cazeau's cell phone, since his phone was broken. Ms. Cazeau had plugged her phone in to charge in the bedroom, since its battery was low, but she told Mr. Chumov he could use it as long as he kept it plugged in. Instead, Mr. Chumov yanked the phone and the cord out of its socket, according to Ms. Cazeau, and began to walk out of the bedroom.

Ms. Cazeau followed Mr. Chumov, trying to grab the phone. When he prevented her from retrieving it, she slapped his cheek. The parties' versions of what happened next differ drastically.

Mr. Chumov claims that after slapping him, Ms. Cazeau punched him in the eye. According to him, the only force he used against Ms. Cazeau was to shove her away, causing her to fall. He claims that Ms. Cazeau then stepped outside the apartment for a few moments, came back in to collect her things, and left for her sister's house.

Ms. Cazeau claims, and testified at Mr. Chumov's trial, that after she slapped him, he hit her in the face, shoved her onto an ottoman in front of the bed, screamed, "Why did you do that? Why did you do that?" and began strangling her. Report of Proceedings (RP) at 108.[1] She estimated the strangulation lasted 15 to 20 seconds. She tried to fight

---

[1] Our record contains four nonconsecutively paginated reports of proceedings. We cite to only the volume containing the trial and sentencing proceedings.

2

back and pry his hands off of her neck. She testified at trial to what happened after he

released his grip on her neck:

> A.    I got up and I had immediately wanted to leave, and so I was walking away. Not walking. I was more running away and I was—I had walked through my bathroom because that was the fastest way for me to get to the front door.
>
> Q.    And can you describe—you were in your bedroom when the event took place?
>
> A.    Mm-hm.
>
> . . . .
>
> Q.    Okay. Ms. Cazeau, were you able to get to the front door?
>
> A.    Eventually.
>
> Q.    Okay. Well, what happened before you made it to the front door?
>
> A.    Um, while I was in the bathroom, he followed me and grabbed me by the back of my neck (indicating) and slammed my head down. And my head hit the mirror. And then the side of my face was on the countertop (indicating), and then he proceeded to choke me again.
>
> . . . .
>
> Q.    Okay. Now, how was Mr. Chumov positioned at this time?
>
> A.    He was over my right shoulder (indicating) kind of like—he was in a weird position to where he was kind of leaning over my shoulder. And then he had one hand over (indicating), and then the other hand was holding my head down onto the counter.
>
> Q.    Now, Ms. Cazeau, what—what effects were you feeling of being choked?
>
> A.    Um, I—I couldn't breathe. My head was hurting. Um, yeah.
>
> Q.    Was Mr. Chumov saying anything while this was going on?
>
> A.    Just the same thing. He just kept saying, "Why did you do that? Why did you do that?" And he was just screaming it in my ear the whole time. And he said his hand was bleeding. He said, "Why did you do that?

Why did you do that? Now my hand's bleeding. Why did you do that?" But I didn't even know what happened to his hand.

. . . .

Q.    Okay. Ms. Cazeau, how long did that choking event last for?

A.    Um, same thing; it—it just felt like forever. It was—it just—probably the same amount of time as the first one.

Q.    Now, are you able to describe the difference in the two chokings? Did one feel worse than the other?

A.    The first one felt worse than the second.

Q.    More pressure?

A.    Yeah.

Q.    So did Mr. Chumov eventually release his grip on you?

A.    Yes.

Q.    And what occurred at that point?

A.    I got up and I started running to finish leaving the bathroom, because I was about halfway through. Um, the door (indicating), the second door to the bathroom was already open, and so I was running through the rest of the bathroom. And I tried opening the door, the front door, but it was locked. And as I was trying to unlock it, he grabbed me again.

Q.    How did he grab you this time?

A.    He, um, grabbed me by my arm and kind of spun me around again to where I was against the wall by the door (indicating), um, and then he started choking me again.

Q.    How did he choke you this time?

A.    It was the same as the first. He had came around (indicating) and then it was two hands across.

Q.    Now, Ms. Cazeau, how would you describe this choking compared to the others?

A.    This one, I think—I felt like it was the worst out of the other two.

Q.    And why so?

4

A.      Um, I—I thought—I felt like I was going to die.  I was scared.  I couldn't breathe.  He—when I was trying to open the door, as he was spinning me around he covered my mouth first and then that's—and then he started choking me, because I was about to scream because I was by the door.

Q.      Now, at any point do you think you began to lose conscious?

A.      Yeah.  I started seeing dots in my vision, and I blacked out for a second.  I couldn't see anything.

. . . .

Q.      Did Mr. Chumov—I guess what was Mr. Chumov saying during this?  Was he saying anything?

A.      Yeah.  He—he just kept saying, "Why did you do that?  Why did you do that?  My hand is bleeding.  Like why did you do this?  Why did you do that?"  And I—I just kept—at that point I—I was able to talk for a second.  And then I—I said, "Okay, okay, I'm sorry, please stop, please stop, just let go."  I—I just—I kept saying that as much as I could, and then I started seeing dots in my vision.

Q.      Do you know what he was referring to when he was saying, "Why'd you make me do that?"

A.      I—I don't.  I—I—I don't know.

Q.      So, Ms. Cazeau, he eventually let go of you?

A.      Yeah.

Q.      What occurred at that point?

A.      He let go, walked into the living room.  And then I—and as he was walking into the living room, I turned around and I opened the door and stepped outside.

RP at 109-14.

According to Ms. Cazeau, she sat outside, catching her breath, for about five minutes.  After calming down, she opened the door and said, "I'm coming in.  I need to get my keys so I can leave."  RP at 115.  Mr. Chumov was sitting in the living room.  Ms.

5

Cazeau grabbed her car keys, phone, and the leash for her puppy, who had followed her outside. This time, Mr. Chumov did not interfere or prevent her from leaving.

Ms. Cazeau sat in her car for a few moments and called her sister to tell her what happened and that she was coming over. As she sat in the car, Mr. Chumov came out and begged her not to call police. Ms. Cazeau ignored him and drove to her sister's home.

By the time Ms. Cazeau reached her sister's house, police officers and a paramedic had already arrived.[2] Ms. Cazeau's parents were also there. Officer Seth Wolfe observed that Ms. Cazeau appeared to have been crying. Photos taken by responding officers showed scratches and bruising on Ms. Cazeau's neck, as well as a red mark on her nose and scratching on her chest. Travis Oliver, a paramedic, observed mild abrasions on the side of Ms. Cazeau's neck, but no significant surface injuries.

Mr. Chumov was charged with second degree assault and unlawful imprisonment. Both were charged as domestic violence crimes.

When the case proceeded to trial, Mr. Chumov moved at half-time to dismiss the unlawful imprisonment charge. Defense counsel reminded the court that Ms. Cazeau testified that she herself locked the front door on arriving home, and she both left through that door and was able to come back into the apartment to gather her belongings. He argued that the alleged strangulation was a separate crime that could not serve as

---

[2] Ms. Cazeau testified that she did not call police. The record is unclear whether it was Ms. Cazeau's sister or parents who contacted law enforcement.

6

evidence for the unlawful imprisonment charge. The State responded that the physical force exerted against Ms. Cazeau was sufficient for a jury to find that she had been restrained without her consent.

The trial court denied the motion, observing that each of the three instances of strangulation might qualify as unlawful restraint.

The jury found Mr. Chumov guilty as charged. At sentencing, the trial court ruled that the two charges constituted the same criminal conduct, explaining that the acts of strangulation "formed the basis for the unlawful imprisonment . . . [t]here's no other allegation that the defendant restrained her other than by an act of physical force." RP at 340-41. Mr. Chumov was sentenced to 6 months of imprisonment and 12 months of community custody. He appeals.

## ANALYSIS

Mr. Chumov's only assignment of error is to the sufficiency of the evidence to support the unlawful imprisonment conviction.

"Due process requires the State to prove all elements of a crime beyond a reasonable doubt." *State v. Washington*, 135 Wn. App. 42, 48, 143 P.3d 606 (2006). When considering a challenge to the sufficiency of evidence, reviewing courts ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d

7

560 (1979); *see also State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980) (adopting the sufficiency of the evidence test articulated in *Virginia*). "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Mr. Chumov argues the evidence was insufficient since Ms. Cazeau had a reasonable means of escape: the front door.

Under RCW 9A.40.040(1), "[a] person is guilty of unlawful imprisonment if he or she knowingly restrains another person." To "'[r]estrain' means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty. Restraint is 'without consent' if it is accomplished by . . . physical force." RCW 9A.40.010(6). An interference is substantial if it is "'real' or 'material'" as opposed to "a petty annoyance, a slight inconvenience, or an imaginary conflict." *State v. Robinson*, 20 Wn. App. 882, 884, 582 P.2d 580 (1978), *aff'd*, 92 Wn.2d 357, 597 P.2d 892 (1979).

Mr. Chumov argues that a known means of escape is a defense to a charge of unlawful imprisonment unless the State proves that the "'"means of escape . . . present[s] a danger or more than a mere inconvenience."'" Br. of Appellant at 7 (alterations in original) (quoting *Washington*, 135 Wn. App. at 50 (quoting *State v. Kinchen*, 92 Wn.

App. 442, 452 n.16, 963 P.2d 928 (1998)). He argues that there was no "danger" to Ms. Cazeau in unlocking the door, only inconvenience.

A means of escape is a defense when, as in *Kinchen*, the unlawful imprisonment is by means of confinement. In *Kinchen*, the defendant, a father of two young boys, was alleged to have unlawfully imprisoned them by locking them in the family apartment in his absence. The evidence was deemed insufficient because not only was a sliding glass door sometimes left unlocked, the boys could, and regularly did, exit and enter the apartment through an unlocked window. 92 Wn. App. at 452. In couching the defense at issue as a "means of escape" that "present[s] a danger or more than a mere inconvenience," *Kinchen* relied on a tort claim for false arrest and false imprisonment by police officers, and on the *Restatement (Second) of Tort's* discussion of "what constitutes confinement." 92 Wn. App. at 452 n.16; RESTATEMENT (SECOND) OF TORTS § 36 (AM. LAW INST. 1965). As observed by the *Restatement* authors, "[i]f the actor *by force* . . . compels another to accompany him . . . , he has as effectively confined the other as though he had locked him in a room." RESTATEMENT § 36 cmt. c (emphasis added).

The fact that the location where one is being restrained has a means of egress is of no help to a victim who is being restrained by the physical force of the defendant. Where, as here, that is the nature of the restraint, the germane issue is whether the restraint by physical force "substantially interferes with the other person's liberty." RCW 9A.40.010(6). The jury was so instructed. *See* Clerk's Papers at 124-25

9

No. 38497-7-III
*State v. Chumov*

(Instructions 15 and 16). As the trial court recognized in denying the motion to dismiss the charge, the evidence of the three acts of strangulation—particularly the evidence that Mr. Chumov twice stopped and strangled Ms. Cazeau as she *tried* to escape—is sufficient.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.