# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 78592-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| GEORGE ABRAHAM DILLON, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 3, 2020 |
| | ) | |

MANN, A.C.J. — George Dillon appeals his conviction and sentence for unlawful imprisonment and third degree assault. Dillon contends that there was insufficient evidence supporting the unlawful imprisonment conviction, that the knowledge instruction relieved the State of its burden of proof, that the trial court improperly admitted evidence of his after-arrest conduct at the hospital, and that the trial court improperly imposed legal financial obligations (LFO) because he is indigent and his sole source of income is his Social Security disability funds.

We remand to strike the LFO that he "pay supervision fees as determined by DOC," the interest accrual provision, and to clarify that the $500 victim assessment fee may not be satisfied out of his Social Security disability funds. We affirm on all other grounds.

I.

On December 21, 2017, George Favors stopped at a 7-Eleven after he got off his bus in Lynwood. Favors takes the bus because he has glaucoma, partial vision in his right eye, and no vision in his left eye. When Favors entered the 7-Eleven, he was listening to music on his large Bluetooth headphones.

Favors encountered Dillon standing near the entrance to 7-Eleven. Favors noticed that Dillon had scratches on his face, was bleeding, and intoxicated. Favors thought that Dillon was panhandling and told him he did not have change. Favors continued into the 7-Eleven.

Dillon entered the 7-Eleven 10 to 15 seconds after Favors. Favors finished making his purchase and started walking towards the exit. Dillon was standing three feet in front of the exit. Dillon told Favors in a slurred voice to "get your ass back over there" and threatened to cut and shoot him. Favors feared that the situation would escalate and went to the back of the store.

Favors tried to leave a second time and Dillon said "I told you one time; get your ass back over there." Favors, who is African-American, recalled hearing a racial slur. Favors discreetly called 911 on his Bluetooth headphones. Other 7-Eleven customers were entering and exiting without issue. The two store clerks were telling Dillon to leave. Favors indicated that Dillon appeared to be intimidating the clerks.

Sergeant Joshua Kelsey of the Lynwood Police Department responded to the call. When Sergeant Kelsey arrived, he found Dillon outside the 7-Eleven, talking to someone in an SUV. Sergeant Kelsey placed Dillon in handcuffs and as he was walking him to his patrol car, Dillon "rear[ed] his head back" and hit Sergeant Kelsey on

his forehead and the bridge of his nose. Sergeant Kelsey recalled that Dillon was intoxicated, his balance was poor, and was making incoherent statements.

Sergeant Kelsey took Favors's statement. The store clerks declined to provide a written statement. Sergeant Kelsey took Dillon to the hospital because Dillon had preexisting injuries on his face. At the hospital, Dillon exhibited mood swings from anger to happiness. Dillon made threatening statements to Sergeant Kelsey and hospital staff, but also talked about loving Sergeant Kelsey and the hospital staff and discussed liking music. Sergeant Kelsey was not treated for any injuries on his face and did not take any pictures of his face where Dillon hit him.

The State initially charged Dillon with third degree assault of Sergeant Kelsey and harassment of Favors, but amended the information to include unlawful imprisonment of Favors. The only witnesses at trial were Favors and Sergeant Kelsey. The defense objected to testimony about Dillon's misconduct at the hospital, but the court ruled that the evidence demonstrated Dillon's state of mind, level of intoxication, and completed the story for the jury.

Favors testified inconsistently about whether he had his Bluetooth headphones on his ears the whole time he was in 7-Eleven, or if he took them off and put them around his neck before paying for his snacks and put them back on when he called 911. Additionally, Sergeant Kelsey testified that Dillon was outside the 7-Eleven when he arrived and Favors testified that Dillon was inside the 7-Eleven when Sergeant Kelsey arrived.

The defense requested a jury instruction on voluntary intoxication and the State did not object. The jury acquitted Dillon of felony harassment, but convicted him of third degree assault and unlawful imprisonment.

During sentencing, the trial court recognized Dillon's history of alcohol and drug abuse and mental illness and imposed a drug offender sentencing alternative. The court imposed $500 in mandatory LFOs and ordered Dillon to make payments of $10 a month starting 60 days after his release. The court also ordered Dillon to pay for his supervision costs after release. Dillon appeals.

II.

We review instructional errors raised for the first time on appeal for manifest constitutional error. RAP 2.5(a); State v. O'Hara, 167 Wn.2d 91, 100-01, 217 P.3d 756 (2009). The defendant must demonstrate that "(1) the error is manifest, and (2) the error is truly of constitutional dimension." O'Hara, 167 Wn.2d at 98. An error is manifest when it results in actual prejudice. O'Hara, 167 Wn.2d at 99. "To demonstrate actual prejudice, there must be a plausible showing by the appellant that the asserted error had practical and identifiable consequences in the trial of the case." O'Hara, 167 Wn.2d at 99 (internal quotations omitted). Even when there is an error of constitutional magnitude, the claim is subject to a harmless error analysis. O'Hara, 167 Wn.2d at 99.

When determining whether sufficient evidence supports a criminal conviction, the court views the evidence in the light most favorable to the prosecution. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). We determine, given the facts, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Kintz, 169 Wn.2d at 551. Direct and circumstantial evidence are

-4-

equally reliable in determining the sufficiency of the evidence. Kintz, 169 Wn.2d at 551. Inferences based on circumstantial evidence, however, must be reasonable and cannot be based on speculation. State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

A.

Dillon contends that the trial court erred when it instructed the jury that Dillon "must have knowledge of the facts, circumstances, or results that constitute a crime, rather than knowledge that the facts, circumstances, and results are a crime." This is so, Dillon argues, because under State v. Warfield, 103 Wn. App. 152, 5 P.3d 1280 (2000), the State must prove beyond a reasonable doubt that Dillon knowingly acted without legal authority. We disagree.

In order to establish the crime of unlawful imprisonment, the State must prove that the defendant "knowingly restrain[ed] another person." RCW 9A.40.040. The word "restrain" has four components: "(1) restricting another's movement; (2) without that person's consent; (3) without legal authority; and (4) in a manner that substantially interferes with that person's liberty." Warfield, 103 Wn. App. at 157; RCW 9A.40.010(6).

In Warfield, the court held that "knowingly" modified all parts of "restrain," including "without legal authority." Warfield, 103 Wn. App. at 156. Thus, the State was required to prove, beyond a reasonable doubt, that the defendant knew he was acting without legal authority. Warfield, 103 Wn. App. at 156. The defendants in Warfield were bounty hunters and believed they had legal authority to extradite the victim, Mark DeBolt, to Arizona under a misdemeanor arrest warrant. Warfield, 103 Wn. App. at 155. Since the Arizona warrant was for a misdemeanor, it had no lawful effect in Washington. Warfield, 103 Wn. App. at 155. The defendants believing the warrant gave them legal

authority to hold DeBolt, acted with good faith. Warfield, 103 Wn. App. at 155-56. The court reversed the defendants' convictions because the State failed to prove they knew they were acting without legal authority. Warfield, 103 Wn. App. at 155-56.

State v. Johnson, 180 Wn.2d 295, 304, 325 P.3d 135 (2014), however, limited the holding of Warfield. The Johnson court determined that Warfield "is limited to those unique cases where the defendant had a good faith belief that he or she had legal authority to imprison a person." Johnson, 180 Wn.2d at 304. While the issue in Johnson was whether the information needed to contain the definition of "restrain" as an essential element of unlawful imprisonment, the court explained that the State does not have to prove a defendant knew he was acting without legal authority, unless facts exist to suggest the defendant had a good faith belief he had legal authority. Johnson, 180 Wn.2d at 303-04.

Consequently, after Johnson, where a claim is raised that a defendant had a good faith belief that they were acting with legal authority, the State must prove that the defendant actually knew that they had no legal authority. But, where no claim of a good faith belief of lawful authority is raised, the State need only prove that the defendant acted knowingly to restrain.

Here, the State did not have to prove that Dillon knew he was acting without legal authority because there were no facts suggesting Dillon believed he had legal authority to restrain Favors. Johnson, 180 Wn.2d at 304.

Regardless, the "law of the case" doctrine applies here; the State must prove the elements included in the to-convict instruction, even when those elements may be

"otherwise unnecessary elements." State v. Johnson, 188 Wn.2d 742, 760, 399 P.3d 507 (2017). Jury instruction 13, the to-convict instruction, stated:

> To convict the defendant of the crime of Unlawful Imprisonment as charged in Count 3, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 21st day of December, 2017, the defendant restrained the movements of George Favors in a manner that substantially interfered with his liberty;
>
> (2) That such restraint was accomplished by physical force or intimidation;
>
> (3) That such restraint was without legal authority;
>
> (4) That, with regard to elements (1), (2), and (3), the defendant acted knowingly; and
>
> (5) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements then it will be your duty to return a verdict of not guilty.

As discussed above, Johnson clarified that the defendant's knowledge that they lacked legal authority is not a necessary element of unlawful imprisonment unless the defendant claims they had a good faith belief they were acting with lawful authority. Consequently, instruction 13 included an erroneous mens rea requirement.[1] But, because instruction 13 included the added mens rea element, the mens rea element

---

[1] Dillon correctly points out that instruction 13 was based on 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 39.16 (4th ed. 2016) (WPIC). It appears WPIC 39.16 was based on the language in Warfield and, after Johnson, contains an incorrect statement of law.

become the law of the case and required the State to prove that Dillon knew he was acting without legal authority.

The State presented sufficient evidence that a reasonable juror could find beyond a reasonable doubt that Dillon knew he was acting without legal authority. The threats that Dillon made had no lawful purpose. Depending on the level of intoxication, a person under the influence can still form the requisite intent to know that their actions are unlawful. Dillon made threats to "cut" and "shoot" Favors, both of which demonstrate that Dillon knew he was acting without legal authority. Dillon "jumped" at Favors to prevent him from exiting the 7-Eleven, further supporting a finding that Dillon knew his actions were unlawfully restraining Favors. Dillon did not say anything that indicated he thought he had legal authority to restrain Favors. Thus, sufficient evidence exists to support that Dillon knew he was acting without legal authority.[2]

### B.

Next, Dillon contends that State v. Kinchen, 92 Wn. App. 442, 963 P.2d 928 (1998), requires the State to prove that Favors had no reasonable means of escape as an element that Dillon knowingly "restrained the movements of George Favors in a manner that substantially interfered with his liberty," and that the State presented insufficient evidence that there was no escape. We disagree.

---

[2] Dillon also contends that the trial court incorrectly instructed the jury on the definition of knowledge, which also relieved the State of its burden to prove that Dillon knew he was acting without legal authority. Instruction 11 stated:

> A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result, when he or she is actually aware of that fact, circumstance, or result. It is not necessary that the person know that the fact, circumstance, or result, is defined by law as being unlawful or an element of a crime.

(Emphasis added); see also WPIC 10.02. Because instruction 11 is an accurate statement of the law, the trial court did not err by giving the instruction.

Restraint is "without consent" if it is accomplished by physical force, intimidation, or deception. RCW 9A.40.010(6). "A substantial interference is a real or material interference with the liberty of another as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict." State v. Washington, 135 Wn. App. 42, 50, 143 P.3d 606 (2006) (internal quotations omitted).

It is a defense to unlawful imprisonment that the victim had a means of escape. "Restraint" has four components and based on the facts of this case, if means of escape had been Dillon's defense, it could have negated either restraining another's movement or restraining in a manner that substantially interferes with a person's liberty. Means of escape "does not automatically preclude prosecution from unlawful imprisonment. But for the State to succeed on this theory, the known means of escape must present a danger or more than a mere inconvenience." Kinchen, 92 Wn. App. at 452, n.16.

First, Kinchen does not require that the State prove there was an absence of a reasonable means of escape. In Kinchen, the court held there was insufficient evidence to support a father's conviction for unlawful imprisonment of his two sons, because the sons had a reasonable means of escape. Kinchen, 92 Wn. App. at 452. The two boys, ages 8 and 9, had Attention Deficit Disorder (ADD) and were "virtually uncontrollable." Kinchen, 92 Wn. App. at 444. Because of this, the father restricted their access to the refrigerator and kitchen cabinets, occasionally locked them in the bathroom as punishment, and put locks on their bedroom door. Kinchen, 92 Wn. App. at 445. The boys had keys to the bedroom, but they lost them and instead, used a window to enter and exit their bedroom. Kinchen, 92 Wn. App. at 452. At other times, the sliding glass door was left unlocked giving the boys access to the main living area of house.

Kinchen, 92 Wn. App. at 452. Additionally, when the father left the boys alone at home, he left them food. The boys also had access to the bathroom and a water supply. Kinchen, 92 Wn. App. at 452. The court concluded that there was insufficient evidence to support the father's conviction for unlawful imprisonment because parents have legal authority to restrict their children's access to areas of the home and the boys were able to leave their bedroom through a window. Kinchen, 92 Wn. App. at 450, 452.

Neither the State nor defense presented any evidence about whether Favors had a reasonable means of escape. This is not, however, fatal to the sufficiency of the evidence inquiry, because escape is a defense and not an element of unlawful imprisonment. Viewed in the light most favorable to the State, Favor's testimony is sufficient to find, beyond a reasonable doubt, that Dillon restrained Favors's movement, in a manner that substantially interfered with his liberty through intimidation, threats of violence, and by blocking the 7-Eleven exit.

Favors attempted to leave the 7-Eleven twice and the second time Dillon said "I told you one time; get your ass back over there" and "jumped at" Favors. Favors testified that Dillon was a "big enough guy he could have just took me and slung me all over the place." A reasonable juror could conclude Favors feared that disobeying Dillon's commands presented a serious risk of danger and that Favors felt intimidated by Dillon's orders and complied to avoid a physical confrontation. Dillon was also acting erratically and intimidating the 7-Eleven clerks who were trying to get Dillon to leave. Favors called 911 discreetly with his Bluetooth headphones after Dillon did not let him exit the 7-Eleven the second time because he "thought maybe he was pretty serious

about this." Thus, sufficient evidence exists supporting that Dillon unlawfully restrained Favors.

III.

Dillon contends that the trial court abused its discretion when it admitted evidence that Dillon made threats and was aggressive toward Sergeant Kelsey and medical staff at the hospital. Dillon contends that the probative value of the evidence did not substantially outweigh the risk of unfair prejudice. We disagree.

We review evidentiary rulings under ER 404(b) for abuse of discretion. State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). A trial court abuses its discretion if its decision is based on untenable grounds, an erroneous view of the law, or is manifestly unreasonable. State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008). If evidence was improperly admitted, the court analyzes whether the improper admission was harmless. Gunderson, 181 Wn.2d at 926.

A.

As an initial matter, the State contends that Dillon did not preserve this issue for appeal because the court noted that its ruling "may be subject to further action and objection as the testimony is actually taken" and Dillon did not object during the examination of Sergeant Kelsey. Dillon responds that the issue is preserved for appeal because when the trial court rules on a motion in limine, the losing party is deemed to have a standing objection unless the trial court indicates that further objections are required when making its ruling.

Dillon cites Powell to support his contention that the losing party to a motion in limine has a standing objection, unless the trial court requires further objections when

-11-

making its ruling. State v. Powell, 126 Wn.2d 244, 256, 893 P.2d 615 (1995). Under Powell, the court explained the difference between final rulings and rulings that are only tentative or advisory. Powell, 126 Wn.2d at 256. When a ruling is tentative, "any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling." Powell, 126 Wn.2d at 257. A trial court's ruling on a motion in limine is final, unless the court indicates that further objections are required during trial. Powell, 126 Wn.2d at 257. The ruling is final even when a trial court "make[s] comments to the effect that its rulings [are] subject to revision." Powell, 126 Wn.2d at 257.

Here, during the trial court's ruling, it stated "I believe the Court is prepared to rule at least at this point in time. This may be subject to further action and objection as testimony actually is taken. But at this point I am respectfully going to deny the defense motion on C and D." The trial court did not indicate that further objections were necessary during testimony to preserve Dillon's objection, thus the evidentiary ruling was preserved for appeal.

B.

Evidence of prior crimes, wrongs, or acts is inadmissible if it is offered to establish a person's character or to show he acted in conformity with that character. ER 404(b). Such evidence, however, is admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. ER 404(b). Before admitting evidence of prior acts, the trial court must:

> (1) find by a preponderance of the evidence that the uncharged acts probably occurred before admitting the evidence, (2) identify the purpose for which the evidence will be admitted, (3) find the evidence materially

-12-

relevant to that purpose, and (4) balance the probative value of the evidence against any unfair prejudicial effect the evidence may have upon the fact-finder.

State v. Kilgore, 147 Wn.2d 288, 292, 53 P.3d 974 (2002). The trial court must balance the probative value and prejudicial effect on the record. State v. Jackson, 102 Wn.2d 689, 694, 689 P.2d 76 (1984).

"Under res gestae or 'same transaction' exception to ER 404(b), evidence of other crimes or bad acts is admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime." State v. Lillard, 122 Wn. App. 422, 432, 93 P.3d 696 (2004). Evidence may "complete the story of a crime" when it rebuts a material assertion by the defendant, such as a claim of self-defense. State v. Thompson, 47 Wn. App. 1, 11-12, 733 P.2d 584 (1987) (defendant testified at trial).

Relevance is still a key component of the court's inquiry. In State v. Grier, 168 Wn. App. 635, 646-47, 278 P.3d 225 (2012), this Court concluded that res gestae evidence "more appropriately falls within ER 401's definition of 'relevant' evidence, which is generally admissible under ER 402" rather than an exception to propensity evidence under ER 404(b).

During arguments on motions in limine, the State contended that Dillon's changing mood, from aggressive and threatening to happy and loving, and Dillon's uncharged threats to law enforcement went to "his state of mind and demeanor on the night of [the] incident." The defense argued that "the fact that Mr. Dillon continued to have a vacillating mood, continued to act out towards medical staff at the hospital [was not] necessary towards the State's case" and "not part of what the State ha[d] to prove .

. . [and] it would be unfairly prejudicial to Mr. Dillon given that [it was] fundamentally not necessary." Specifically, the defense argued Sergeant Kelsey could testify that "Mr. Dillon's mood was all over the place, that he was one minute saying he loved him and singing and the other moment he was in a very different mood, a dark mood. But to say that he threatened people [constitutes] 404(b) evidence [and] should be excluded."

The court conducted an ER 404(b) analysis indicating:

I will find that given what has been described that these acts probably did occur. I have nothing really to challenge the factual basis that the prosecutor has recited. So I will find that the first prong basically has been identified.

The purpose is in relation to this mental state that we have been talking about which includes, again, I think reference to intoxication and so on. But I think these, quote, other bad acts involving threatening or other type of behavior are being offered to address what his apparent mental state is.

And as suggested in prong number three, I find that this is relevant and that this evidence is relevant on those issues.

And in balancing the probative value, yes, the Court recognizes that any description about threats has some prejudice. But I think it is outweighed by the relevance in terms of more fully addressing evidence about his mental state on the night in question. Indeed, as I suggested, this evidence may cut different ways. And I think arguably would undercut any potential prejudice.

So, for all those reasons, whether one uses a 404(b) analysis or just conclude that this is part of the res gestae on the night in question, which I think arguably it is, either way, at this point at least, I am respectfully denying defense motions as to C and D.

The court found that the evidence of threats and aggression at the hospital was relevant to show Dillon's mental state at the time of the incident, and since Dillon was advancing a voluntary intoxication defense, it was relevant to show the level of Dillon's intoxication.

During direct examination of Sergeant Kelsey, the prosecutor asked about Dillon's demeanor at the hospital, to which Kelsey replied:

[Sergeant Kelsey]: There were words to me, to the nurses, to the doctors. It was—if he would get eye contact with you, he would stare at you. And, again, sometimes it would be aggressive threats made and then other times how much he liked music and then other times how much he loved you.

[Prosecutor]: So did he make any specific threats to you at the hospital?

[Sergeant Kelsey]: There were words to the effect that I am going to kick your ass. I don't recall any other specific quotes or statements.

The trial court did not abuse its discretion because the evidence of Dillon's threats and aggressive behavior at the hospital was relevant to show his mental state and the level of his intoxication. The defense proposed instructions regarding voluntary intoxication. The State did not object to the defense's proposed instruction on voluntary intoxication. Dillon's state of mind and level of intoxication were relevant to both the State and defense's theories of the case.

"Both prior and subsequent hostile acts or declarations have been found admissible, to issues of motive, deliberation and state of mind, where relevant to such conditions as of the time of the offense." State v. Finch, 137 Wn.2d 792, 822, 975 P.2d 967 (1999). "A defendant's hostility toward his victims, even though expressed prior to or subsequent to the crime, may be admitted to show that the hostility existed at the time of the crime." Finch, 137 Wn.2d at 822. In Finch, the court admitted a letter written by the defendant while in jail that showed the defendant's hostility towards the victims. Finch, 137 Wn.2d at 821-22. The hostile statements were close in time to the murder, thus they remained relevant to the State's case. Finch, 137 Wn.2d at 824. Here, Dillon's hostility towards Sergeant Kelsey continued at the hospital, and therefore was admissible to show his hostility at the time of the crime.

-15-

Further, the evidence was admissible to show Dillon's level of intoxication. The defense requested an instruction on voluntary intoxication. "What is relevant is the degree of intoxication and the effect it had on the defendant's ability to formulate the requisite mental state." State v. Priest, 100 Wn. App. 451, 455, 997 P.2d 452 (2000); RCW 9A.16.090. Since Dillon's defense was that he was too intoxicated to form the requisite mental state, more testimony about Dillon's level of intoxication had a low prejudicial effect. Evidence of Dillon's intoxication assisted the jury in determining whether Dillon was unable to form the requisite mental state.

The court erred, however, when it characterized the evidence at the hospital as "res gestae" evidence because the cases cited by the State are inapplicable here. Res gestae evidence characterizes evidence that occurs prior to the crime charged or immediately after and explains the context of the crime charged. Here, the evidence at the hospital does not complete the story or provide context for the crimes charged.

The State cites State v. Lane, 125 Wn.2d 825, 831, 889 P.3d 929 (1995), but in Lane the court allowed evidence that showed bad acts and uncharged crimes leading up to a brutal murder. The testimony included several witnesses regarding the two to three day period before the defendants abducted the victim and demonstrated the "degree of participation" of the each of the defendants in the murder. Lane, 125 Wn.2d at 833-34. The State also cites Grier, but in Grier the court allowed evidence that showed the defendant brandishing a gun and acting belligerently before the shooting and was relevant to show a continuing course of action and set the stage for the shooting. Grier, 168 Wn. App. at 648. Here, the evidence at the hospital of Dillon's demeanor occurred after Dillon completed the crimes and his arrest. The evidence did

not "set the stage" or provide additional context about the crimes charged. Thus, this evidence was not "res gestae" evidence.

The trial court did not abuse its discretion because the evidence was admissible to show Dillon's hostility towards Sergeant Kelsey and level of intoxication.

V.

Dillon challenges several LFOs associated with his sentence. We address each in turn. First, Dillon contends that the trial court improperly imposed, as a condition of community custody, that he "pay supervision fees as determined by DOC." We agree.

Dillon is indigent. RCW 9.94A.703(2) provides that "unless waived by the court, as part of any term of community custody, the court shall order an offender to: (d) Pay supervision fees as determined by the department." Since the supervision fees are waivable by the trial court they are discretionary LFOs. State v. Lundstrom, 6 Wn. App. 2d 338, 396 n.3, 429 P.3d 1116 (2018) rev. denied, 193 Wn.2d 1007 (2019).

The record demonstrates that the trial court intended to impose only mandatory LFOs; thus, we strike the community custody supervision fee. At sentencing, the trial court stated it would waive the DNA fee, the filing fee, and "simply order $500 victim penalty assessment, which is still truly mandatory, as well as restitution, if any." The trial court did not mention supervision fees. Under the section in the judgment and sentence on LFOs, the trial court ordered Dillon to pay a $500 victim assessment fee and noted that the total LFOs did not include restitution, which may be set by later order of the court under RCW 9.94A.753. In the judgment and sentence, there is no option to order the payment of supervision fees under the section on LFOs. Under the section in the judgment and sentence on community custody conditions, the requirement that

-17-

Dillon "pay supervision fees as determined by DOC" is buried in a lengthy paragraph on community custody. From this record, it appears that the trial court intended to waive all discretionary LFOs, but inadvertently imposed supervision fees because of its location in the judgment and sentence.

Second, Dillon contends that remand is necessary to strike the interest accrual provision. The State concedes that the interest accrual in the judgment and sentence should be struck. Financial obligations, excluding restitution, no longer accrue interest. RCW 3.50.100(4)(b). We accept the State's concession.

Finally, Dillon contends that the court should remand to strike the $500 mandatory LFO because Dillon's sole source of income is his Social Security disability funds and garnishment of these funds violates 42 U.S.C. § 407(a).[3] The State responds that "even when Social Security benefits are a person's sole source of income, a court can properly impose mandatory legal financial obligations."

In State v. Catling, 193 Wn.2d 252, 438 P.3d 1174 (2019), the court held that Social Security benefits could not be used for debt retirement. We remand to the trial court to amend the judgment and sentence to indicate that the $500 victim assessment fee may not be satisfied out of any funds subject to 42 U.S.C. § 407(a).

We affirm in part, reverse in part, and remand to the trial court to modify the LFOs consistent with this opinion.

---

[3] 42 U.S.C. § 407(a) states that "The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."

_Mann, ACJ_

WE CONCUR:

_Andrus, J._        _Appelwick, CJ_