IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79128-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| KAILEN EARL HALL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SMITH, J. — Kailen Hall appeals his conviction for felony violation of a no-contact order protecting Shalina Mays. He argues that the evidence was insufficient to support his conviction. He also argues that the trial court erred by ordering him to have no contact with Mays for five years. Specifically, he asserts that the trial court, which sentenced him to five years' total confinement but ordered that he receive credit for time served, erred by not also reducing the term of the no-contact condition to account for time served. Finally, Hall argues that because he is indigent, the trial court erred by ordering him to pay Department of Corrections (DOC) supervision fees. We affirm but remand to the trial court to strike the DOC supervision fees.

FACTS

In December 2016, the Pierce County District Court entered a no-contact order (2016 NCO) that identified Hall as the "Defendant." The 2016 NCO directed the "Defendant" as follows with regard to Shalina Mays, the "protected person":

> A.  [D]o not i) cause, attempt or threaten to cause bodily injury to, assault, sexually assault, harass, stalk or keep under surveillance the protected person or, ii) engage in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, or iii) use, attempt to use or threaten to use physical force against the intimate partner or child that would reasonably be expected to cause bodily injury.
> B.  [D]o not contact the protected person, directly, indirectly, in person or through others, by phone, mail, or electronic means, except for mailing or service of process of court documents through a third party, or contact by the defendant's lawyers.
> C.  [D]o not knowingly enter, remain, or come within 500 feet . . . of the protected person's residence, school, [or] workplace.

The second page of the 2016 NCO bore an acknowledgment stating, "I acknowledge receipt of a copy of this order."  Below the acknowledgment was a signature line for "Defendant," and a signature appeared on that line.  The expiration date of the 2016 NCO was May 14, 2019.

In 2018, the State charged Hall with two counts of domestic violence felony violation of a court order for violating the 2016 NCO.  At trial, Sergeant Robert Constant of the Kent Police Department testified that on June 3, 2018, at about 6:30 p.m., multiple police units were dispatched to a house located at 22707 114th Place Southeast in Kent in response to a 911 call.  On that call, a part of which was played for the jury, a woman who identified herself as Mays reported that she was at a house in Kent and that "he just busted my . . . window."  When the 911 dispatcher asked the caller, "What's his last name," the caller responded, "Hall."  The dispatcher then asked the caller, "And his first name?"  The caller responded, "Kailen."

Sergeant Constant testified that he was the first to arrive at the house.  He ran up to the front door, and just as he was getting to the door, he heard a noise

that he believed was caused by someone jumping over a chain link fence in the backyard. He did not see anyone, but he called out on his radio that someone had gone into the woods behind the house.

Sergeant Constant testified that he then returned to the front door area of the house and spoke with a woman who later identified herself as Mays. The woman told Sergeant Constant that someone had been at the house and "busted the window." She also told Sergeant Constant that the person ran off when Sergeant Constant approached. Three suspects—none of whom was Hall—were later stopped in connection with this incident, which served as the basis for the first count against Hall (count 1).

The second count (count 2) arose from another 911 call made later that same evening. In that call, which also was played for the jury, a woman who identified herself as Mays explained to the dispatcher that "I'm calling because . . . the police just left here . . . . My ex-boyfriend is calling and threatening me right now." The dispatcher asked the caller, "How long ago did you hear from him?" and the caller responded, "Just right before I called you." The dispatcher then asked the caller, "Is he saying he's gonna come back over to the house?" The caller responded, "Yes, and he's in a . . . Subaru Outback, I think it is." The caller then confirmed that she was referring to Hall. When the dispatcher asked the caller again how many minutes ago Hall had called, the caller responded, "About one. He called like four times."

About 15 seconds later, while still on the phone with the dispatcher, the caller said, "Somebody's here," and then, "Yep, it's him, he's here . . . in a

3

silver . . . Subaru . . . [Forester]." The caller then reported a license plate number to the dispatcher. About 30 seconds later, after describing Hall to the dispatcher, the caller reported, "He got out [of] the car; he's at the window. And my window's . . . busted open." The dispatcher later asked, "Can he see you from where . . . he is?" The caller responded, "Yes, yes." When the dispatcher asked, "What is he doing," the caller responded, "Talking." The dispatcher asked, "Talking to you, or talking to someone else?" The caller responded, "I don't know." Later on the call, a woman's voice could be heard in the background saying, "Don't threaten me. Get away from my fucking window." It is unclear whether that voice belonged to the caller. Later, however, the caller could be heard saying, "Go away. Go away." A man's voice could then be heard in the background, though his words were indiscernible. Over the next minute or so, bits and pieces of a background dialogue could be heard on the call, including the caller's voice saying, "I don't want anything from [indiscernible]," followed by a response from a male voice, and then the caller's voice saying, "No." About six-and-a-half minutes into the call, the caller confirmed to the dispatcher that Hall was still outside. The caller later told the dispatcher that she had moved to the back of the house and did not know whether Hall was still there.

Officer William Morrison was dispatched to the house. He later testified that he drove to the intersection of 116th Avenue Southeast and 227th Place Southeast. From there, he "observed a silver Subaru Forester drive northbound out of 114th Place and turn left westbound onto Southeast 227th Place." He explained that 114th Place is "just a little drive that immediately turns into a cul-

4

de-sac" and that the Forester exited from the only entry or exit point for a vehicle. Officer Morrison advised via radio that he saw the Forester and that it had turned left and was heading westbound on 227th Place. Officer Morrison testified that he then started following the Forester and, at some point, another officer turned in front of him. The officers then stopped the Forester and detained two subjects, later identified as Hall and his girlfriend, Brandy Lahue.

Sergeant Constant arrived at the scene after Lahue and Hall had been detained. He explained to Hall why he was contacting him and talked to him about the first incident. Sergeant Constant later testified that Hall "denied basically the whole incident." Sergeant Constant then asked Hall questions about going to the house a second time. According to Sergeant Constant, Hall "said, no, he had hung out by the mailboxes, and . . . there was a woman that was with him, [and] he had the woman go up to the house in his place." Sergeant Constant testified that Hall said, "[h]e was aware of the court order between himself and . . . Mays," but "he didn't violate the order because he stayed at the mailboxes."

Before trial, Hall moved in limine to redact parts of the 2016 NCO. He pointed out that because the 2016 NCO was a domestic violence no-contact order, it contained references to his being convicted of a domestic violence crime. He also pointed out that the 2016 NCO "notifies the defendant about possible consequences, such as being charged with a criminal offense, should the order be violated." Hall argued that "[t]his information is clearly more prejudicial than probative in a Violation of No Contact Order trial." The State

opposed the motion, arguing that Hall's redaction request was "too broad." After the parties presented their respective proposed redacted versions to the trial court, Hall again proposed that the warning language in the 2016 NCO be redacted, and the court granted Hall's request. Thus, the version of the 2016 NCO that was later admitted at trial did not include the redacted warning language.

After Hall's case was submitted to the jury, the trial court declared a mistrial on—and later dismissed—count 1 after concluding that the jury was deadlocked. The jury found Hall guilty on count 2.

On October 31, 2018, the trial court sentenced Hall to a total of five years' confinement, with credit for time served as determined by the King County Correctional Facility. The court also ordered that Hall have no contact with Mays "[f]or the maximum term of 5 years." The court entered a separate Domestic Violence No-Contact Order protecting Mays that expires on October 31, 2023, i.e., five years after the sentencing date (2018 NCO). The court also imposed community custody for "0 months, plus all accrued early release time at the time of release" and ordered Hall to pay supervision fees as determined by DOC. Hall appeals.

**DISCUSSION**

<u>Sufficiency of the Evidence</u>

Hall argues that the evidence was insufficient to support the following findings required by the court's to-convict instruction: (1) "[t]hat on or about June 3, 2018, there existed a protection order or a no-contact order applicable to

[Hall]" and (2) "[t]hat on or about said date, [Hall] knowingly violated a provision of [that] order." We disagree.

To satisfy the Fourteenth Amendment's due process guarantee, the State "bears the burden of proving every element of every crime beyond a reasonable doubt." State v. Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018); U.S. CONST. amend. XIV. When a defendant challenges the sufficiency of the evidence presented to meet this burden, "he or she admits the truth of all of the State's evidence." State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). "In such cases, appellate courts view the evidence in the light most favorable to the State, drawing reasonable inferences in the State's favor." Cardenas-Flores, 189 Wn.2d at 265-66. "Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." Cardenas-Flores, 189 Wn.2d at 265. For the reasons that follow, a rational trier of fact could find both that there existed a no-contact order applicable to Hall and that Hall knowingly violated a provision of that order.

*Existence of Order Applicable to Hall*

Hall contends that the evidence was insufficient for a jury to find that the 2016 NCO was applicable to him. We disagree.

Hall was named as the "Defendant" on exhibit 12 (the redacted version of the 2016 NCO that was admitted into evidence), and the no-contact prohibitions in exhibit 12 were expressly directed at "Defendant." Additionally, it is clear from exhibit 12 that the 2016 NCO expressly prohibited the "Defendant" from, among

other things, contacting Mays "directly, indirectly, in person or though others."

Finally, it was clear from exhibit 12 that the 2016 NCO's expiration date was May

14, 2019.  For these reasons, there was sufficient evidence for the jury to find

"[t]hat on or about June 3, 2018, there existed a protection order or a no-contact

order applicable to [Hall]."

Hall disagrees and argues that because exhibit 12 did not contain

statutorily required warning language because it had been redacted, it was not

sufficient to sustain a finding that the order was applicable to him.  But Hall's

argument conflates the threshold question of an order's validity, which is a

question of law decided by the trial court, with the factual question of an order's

existence—a jury question.  See State v. Miller, 156 Wn.2d 23, 31, 123 P.3d 827

(2005) ("[I]ssues relating to the validity of a court order (such as whether the

court granting the order was authorized to do so, whether the order was

adequate on its face, and whether the order complied with the underlying

statutes) are uniquely within the province of the court."); see also City of Seattle

v. May, 171 Wn.2d 847, 853, 256 P.3d 1161 (2011) ("[T]he validity of the order,

*as opposed to its existence*, [is] neither a statutory nor an implied element of the

crime.  Instead, . . . '[t]he court, as part of its gate-keeping function, should

determine as a threshold matter whether the order alleged to be violated is

applicable and will support the crime charged.'" (emphasis added) (third

alteration in original) (citation omitted) (quoting Miller, 156 Wn.2d at 31)).

Here, Hall did not—and does not—argue that the 2016 NCO was not valid

as a threshold matter of *law* such that it would not support the crime charged.

See Miller, 156 Wn.2d at 31 ("Questions of law are for the court, not the jury, to resolve."). Rather, he argues that exhibit 12 was insufficient for a jury to find, necessarily as a matter of *fact*, that there existed an order applicable to Hall at the relevant time. See State v. Roth, 131 Wn. App. 556, 561, 128 P.3d 114 (2006) ("[I]t is the function and the province of the jury to . . . decide disputed questions of fact."). This argument fails because, as discussed, exhibit 12 was sufficient to support that factual finding.

Hall also contends, relying on the law of the case doctrine, that although the validity of a no-contact order is not an element of the crime of violating a no-contact order,[1] the to-convict instruction given in his case made it an element. Specifically, he asserts that because the court's to-convict instruction required a finding that the 2016 NCO was applicable to him, the State was required—and failed—to prove that the 2016 NCO was valid.[2] Hall relies on State v. Turner, 156 Wn. App. 707, 235 P.3d 806 (2010), to support his assertion, but his reliance is misplaced.

In Turner, we did, as Hall points out, state that "'[a]n order is not applicable to the charged crime if it is not . . . statutorily sufficient.'" 156 Wn. App. at 712-13 (quoting Miller, 156 Wn.2d at 31). But we quoted Miller for that proposition, and a careful reading of Miller reveals that the term "applicability," as used in the

---

[1] See Miller, 156 Wn.2d at 31 (holding that "the validity of [a] no-contact order is not an element of the crime" of violating such an order).

[2] Under the "law of the case" doctrine, the State must prove all elements included without objection in the to-convict instruction, whether or not those elements are required by statute. State v. Johnson, 188 Wn.2d 742, 754, 399 P.3d 507 (2017).

context of that case, refers not to applicability in the *factual* sense, but to an order's legal validity. See Miller, 156 Wn.2d at 31 ("[I]ssues relating to *the validity of a court order* (such as whether . . . the order was adequate on its face, and whether the order complied with the underlying statutes) are uniquely within the province of the court. *Collectively, we will refer to these issues as applying to the 'applicability' of the order to the crime charged.*" (emphasis added)); cf. May, 171 Wn.2d at 854-55 (distinguishing an order's validity from its applicability and describing an "inapplicable" order as one that "either does not apply to the defendant or does not apply to the charged conduct").

In short, Turner does not, despite its reference to "applicability," support Hall's contention that by using the word "applicable," the to-convict instruction added an element and required the jury to determine the 2016 NCO's validity. Rather, the jury was merely asked to determine whether the order was applicable in the factual sense.[3]  And as already discussed, the evidence was sufficient to support the jury's finding that it was.

*Knowing Violation of Order*

Hall next contends that the evidence was insufficient for the jury to find "[t]hat on or about [June 3, 2018], [Hall] knowingly violated a provision of" the 2016 NCO.  Again, we disagree.

The 2016 NCO prohibited Hall from contacting Mays, "directly, indirectly,

---

[3] Our conclusion is supported by the fact that the relevant pattern instruction, WPIC 36.51.02, also includes the term "applicable."  See 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 36.51.02, at 674 (4th ed. 2016).

in person or through others, by phone, mail, or electronic means." And as discussed, the jury heard a 911 call in which a caller who identified herself as Mays told the dispatcher that Hall had just called her multiple times and then, while still on the phone with the dispatcher, reported that Hall had arrived and was standing at the broken window, talking. Later, a dialogue could be heard in the background between the caller and an unidentified male voice.

A rational juror could reasonably have inferred from the 911 call that the caller was Mays and that Hall had just telephoned Mays multiple times, in violation of the 2016 NCO's prohibition on contacting Mays "directly, indirectly, in person or through others, by phone . . . or electronic means." A juror also could reasonably have inferred that Hall was the man heard talking in the background and that Hall was talking to Mays, also in violation of the 2016 NCO's prohibition on contact. Finally, a juror could reasonably have inferred that Hall's violations were knowing based both on (1) a reasonable inference that the signature on the 2016 NCO was Hall's and (2) Sergeant Constant's testimony that Hall stated he was aware of the court order between himself and Mays.[4] For these reasons, the evidence was sufficient to support a finding that Hall knowingly violated a provision of the 2016 NCO.

Hall disagrees and contends that merely "[b]eing outside the house does not constitute contact with Mays," and the second 911 call did not establish that

---

[4] The jury was instructed that "[i]f a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact."

Hall actually communicated with Mays. But Hall cites no authority to support his contention that standing outside a broken window from which he could see Mays inside the house was not enough to constitute contact. Additionally, and as discussed, reasonable inferences from the second 911 call support a finding that Hall did communicate with Mays, both by telephoning her and talking through the window. Therefore, Hall's argument fails.

Hall also contends that the evidence was insufficient to show that the house from which Mays called 911 was her residence and, thus, the State failed to prove that Hall violated the provision of the 2016 NCO prohibiting him from coming within 500 feet of the protected person's residence. But as discussed, the evidence was sufficient to support Hall's conviction based on the provision of the 2016 NCO prohibiting Hall from contacting Mays. Thus, Hall's contention fails.

### 2018 NCO

Hall argues that the 2018 NCO's October 31, 2023, expiration date is erroneous because it fails to take into account credit for time served. We disagree.

The trial court issued the 2018 NCO under chapter 10.99 RCW. To that end, RCW 10.99.050(1) provides that "[w]hen a defendant is found guilty of a crime and a condition of the sentence restricts the defendant's ability to have contact with the victim, such condition shall be recorded and a written certified copy of that order shall be provided to the victim." In other words, RCW 10.99.050(1) directs the court to issue a no-contact order "to record a no-

12

contact condition of the sentence." State v. Granath, 190 Wn.2d 548, 556, 415 P.3d 1179 (2018).

Here, Hall was found guilty of felony violation of a no-contact order. The maximum term for that crime, based on Hall's offender score, was five years. Thus, the trial court was authorized, as part of Hall's felony sentence, to order Hall to have no contact with the victim, Mays, for five years beginning on October 31, 2018, the date of sentencing. State v. Armendariz, 160 Wn.2d 106, 108, 156 P.3d 201 (2007); see also State v. France, 176 Wn. App. 463, 473, 308 P.3d 812 (2013) ("[T]he S[entencing ]R[eform A[ct] . . . authorize[s] trial courts to impose crime-related prohibitions as a condition of sentence."). The trial court did so and, consistent with RCW 10.99.050(1), entered the 2018 NCO, with an expiration date of October 31, 2023, to record that condition. There was no error.

Hall disagrees. Relying on State v. Navarro, 188 Wn. App. 550, 354 P.3d 22 (2015), he argues that because he received credit for time served in confinement, that credit also applied to the no-contact condition of his sentence and, thus, the 2018 NCO's expiration date was erroneous. But the part of Navarro on which Hall relies involved sexual assault protection orders. See Navarro, 188 Wn. App. at 555. By statute, sexual assault protection orders expire "'two years following the expiration of any sentence *of imprisonment* and subsequent period of community supervision, conditional release, probation, or parole.'" Navarro, 188 Wn. App. at 554 (emphasis added) (quoting RCW 7.90.150(6)(c)). In other words, the term of the protection orders at issue in Navarro were, by statute, tied to the defendant's term of confinement. We thus

13

held, in Navarro, that "[b]ecause an offender's actual release date is unknowable at the time of sentencing, a sexual assault protection order should not provide a fixed expiration date." Navarro, 188 Wn. App. at 555-56.

Here, by contrast, the trial court entered a no-contact order, which is not the same as a sexual assault protection order. See Navarro, 188 Wn. App. at 552 ("A sexual assault protection order protects a victim from contact with an offender who is not otherwise restrained. Conviction of the offender is not a prerequisite. No-contact orders, on the other hand, are not limited to victims, and they are entered only after the offender is convicted of a crime. *There are different provisions governing the length of time these orders may remain in effect.*" (emphasis added)). And as discussed, the trial court was authorized to enter a no-contact order for the maximum term of five years. Armendariz, 160 Wn.2d at 108. Therefore, Hall's reliance on Navarro is misplaced.

Hall's reliance on Granath is also misplaced. There, our Supreme Court held that RCW 10.99.050(1) does not give a district court, whose jurisdiction is limited by statute, independent authority to issue no-contact orders. Granath, 190 Wn.2d at 556-57. Rather, RCW 10.99.050(1) merely authorizes a district court to enter a no-contact order that records the no-contact condition of a sentence. Granath, 190 Wn.2d at 556. And because the no-contact condition of the sentence at issue in Granath lasted only two years, the district court erred by entering a five-year no-contact order. Granath, 190 Wn.2d at 557.

Here, the no-contact condition of Hall's sentence was properly ordered to last a maximum of five years from the date of sentencing. Thus, consistent with

14

Granath, the no-contact order issued to record this condition was set to expire five years after the date of sentencing, on October 31, 2023. This was not error.

### DOC Supervision Fees

Hall argues that remand is required for the trial court to strike the DOC supervision fees. We agree.

RCW 9.94A.703(2)(d) provides that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the [DOC]." Because supervision fees can be waived by the court, they constitute discretionary LFOs. See RCW 9.94A.030(31) ("'Legal financial obligation' means a sum of money that is ordered by a superior court of the state of Washington for legal financial obligations which may include . . . any . . . financial obligation that is assessed to the offender as a result of a felony conviction."); State v. Lundstrom, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018) (costs of community custody are discretionary LFOs). To this end, a trial court's decision whether to impose a discretionary LFO is reviewed for abuse of discretion. State v. Ramirez, 191 Wn.2d 732, 741, 426 P.3d 714 (2018).

Here, the record reflects that the trial court intended to waive all discretionary LFOs. Specifically, when explaining why it was ordering Hall to pay a $500 victim penalty assessment, the trial court stated, "A $500 victim penalty assessment; that's mandatory. *I can't waive that even though I understand you're going to be locked up and you're not going to have any money, but I can't – I don't have any discretion to not impose that*." (Emphasis added.) Because

15

the trial court intended to waive all discretionary LFOs but did not waive DOC supervision fees, we remand to the trial court to strike the DOC supervision fees.

The State contends that the trial court properly ordered Hall to pay DOC supervision fees because they are not "costs" that the trial court is prohibited from imposing on an indigent defendant under RCW 10.01.160. But assuming without deciding that DOC supervision fees are not costs within the meaning of RCW 10.01.160, they nonetheless constitute discretionary LFOs. And as we recently observed, "The barriers that LFOs impose on an offender's reintegration to society are well documented . . . and should not be imposed lightly merely because the legislature has not dictated that judges conduct the same inquiry required for discretionary costs." State v. Clark, 191 Wn. App. 369, 376, 362 P.3d 309 (2015). Furthermore, and as discussed, the record in this case reflects that the trial court intended to waive any discretionary LFOs. For these reasons, remand is appropriate. Cf. State v. Dillon, ___ Wn. App. 2d ___, 456 P.3d 1199, 1209 (2020) (striking DOC supervision fee where "[t]he record demonstrate[d] that the trial court intended to impose only mandatory LFOs").

We affirm but remand to the trial court to strike the DOC supervision fees.

WE CONCUR:

_____                _____