IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　Respondent,<br><br>　　v.<br><br>AWET HAGOS GEBREMARIAM,<br><br>　　　　　Appellant. | No. 85179-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Awet Hagos Gebremariam appeals from his conviction for indecent liberties, based on the instigation of sexual contact with a developmentally disabled adult. He assigns error to the court's admission of evidence of a prior interaction with the named victim and requests modification of a community custody condition. He further seeks an order striking the victim penalty assessment (VPA) and DNA collection fee from his judgment and sentence due to his indigency. We affirm his conviction, but reverse in part and remand to amend the condition and strike the legal financial obligations.

## FACTS

In January 2020, Gebremariam worked as a driver for King County Metro, driving for the Access program, which provides transportation services to people with disabilities. K.T. routinely used this program for trips to her job in childcare. K.T. was 36 years old at the time, but was alleged to have the cognitive

development of a 12- to 14-year-old.[1] On January 6, Gebremariam picked up K.T. from her adult group home to take her to work. K.T. said that when she boarded the bus on the date in question, Gebremariam asked her for a hug, repeatedly said "peekaboo" to her, and asked her to be his girlfriend.

Gebremariam dropped off another Access passenger, but made a detour instead of taking K.T. directly to work and made a comment about them having sex.[2] He pulled off the road and into a parking lot, then walked back to where K.T. was sitting and started talking to her. K.T. would later tell detectives that Gebremariam had told her she had on "a low cut shirt." K.T. alleged he kissed her and touched her chest with one finger, under her shirt and over her bra. She testified that Gebremariam asked if she wanted to "feel" his body, then took her hand, placed it on his crotch, and moved her hand up and down. While doing this he told her, "It's ok, no one can see. No one will tell." K.T. insisted that the delay would make her late to work, so Gebremariam stopped, returned to the front of the bus, and took her to work after telling her that he was "just kidding."

K.T. did not report the incident upon arriving at work, but when she returned home, she called her mother, R., and told her what had happened. R. later testified that K.T. sounded "hyperactive" and "like she was going to cry" as she described what had happened on the bus. R. also told K.T. to write down everything she

---

[1] The State readily admitted it would not present expert testimony regarding the exact nature and implications of K.T.'s condition and it is not evidenced in the record beyond the testimony of her mother, R.

Because they share the last name, and out of respect for K.T.'s privacy, we use initials to refer to her parents as well.

[2] The other passenger was not questioned by law enforcement and did not testify at trial. The caretaker for that passenger had stated to Detective Alan Garrison that she was "almost non communicative."

could remember about what had happened. K.T. discussed the incident with her roommate, Laura,[3] and the woman running the home, Christina Nhet, overheard them. Nhet later testified that after coming home, K.T. "was crying" on the phone and, when asked what was the matter, told Nhet that "on her way to work, the bus driver tried to kiss her and put his hand into her bra."

King County Sheriff's Office (KCSO) Deputy Matt Wynkoop responded to the initial call and spoke to K.T.'s father, G. Wynkoop did not speak to K.T., but did collect the notes she had made on January 6. KCSO Detectives Alan Garrison and Christine Parks met with K.T. and her parents in their home in late January. Garrison contacted Gebremariam after the interview with K.T. and Gebremariam met with Garrison at his office. Gebremariam told Garrison that the van's navigation system had not provided a correct route between stops and he had pulled into the parking lot because of a concerning smell that Gebremariam thought might be the tires. Gebremariam denied that any sexual conversations or inappropriate touching had occurred. Garrison also spoke to Gebremariam's supervisors who were able to corroborate the route Gebremariam had taken that day based on stored data. The Access van did not have inward facing cameras, so the alleged incident was not caught on video.

The State charged Gebremariam with one count of indecent liberties and specifically alleged that he committed the offense against a developmentally disabled person, as defined by RCW 71A.10.020, while he "[w]as providing

---

[3] Laura's last name is not present in the record.

transportation, within the course of [his] employment, to the victim."[4]  In its motions in limine, the State sought admission of another interaction between K.T. and Gebremariam, purported to have occurred about a month prior to the charged incident.  The State asserted that while Gebremariam was driving K.T. to work, he had stopped in another parking lot, played peekaboo with K.T., and touched her knee.  The State offered this prior act under ER 404(b) as evidence of a common plan and opportunity or, alternatively, as res gestae.  Gebremariam objected and argued that the State had provided an inaccurate statement of the law regarding the requirements for admitting other act evidence.  The trial judge ultimately admitted the prior incident after hearing testimony from K.T. outside the presence of the jury and entering findings of fact and conclusions of law.

At trial, the jury heard testimony from K.T., R., Wynkoop, and Garrison, as well as people who oversaw aspects of the Access program.  The defense sought to impeach K.T. and R. by eliciting testimony from R. that the family had filed a civil suit for negligence against King County, seeking $1 to $2 million in damages.  The jury convicted Gebremariam as charged.

Gebremariam timely appealed.

---

[4] Indecent liberties is an alternate means crime.  Here, the State charged Gebremariam under RCW 9A.44.100(1)(c)(ii), which specifically relies on the definition of developmental disability set out in RCW 71A.10.020.  That statute establishes that

"[d]evelopmental disability" means a disability attributable to intellectual disability, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to an intellectual disability or to require treatment similar to that required for individuals with intellectual disabilities, which disability originates before the individual attains age eighteen, which has continued or can be expected to continue indefinitely, and which constitutes a substantial limitation to the individual.

RCW 71A.10.020(6).

ANALYSIS

I.    Admission of Other Act Evidence

Gebremariam assigns error to the admission of evidence under ER 404(b) regarding a prior interaction between him and K.T., alleged to have occurred in an Access van a month before the charged incident.  The State claimed that Gebremariam had driven off route with K.T. in the van, parked in a QFC parking lot, played "peekaboo" with her, and touched her knee.  In seeking admission of this evidence, the State argued that it was highly probative because K.T.'s testimony and credibility were essential to the State's case.

We consider the interpretation of an evidentiary rule by a trial court de novo. *State v. Arredondo*, 188 Wn.2d 244, 256, 394 P.3d 348 (2017).  Then, the trial court's decision to admit evidence is reviewed for abuse of discretion.  *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007).  The trial court has abused its discretion if the admission is based on untenable grounds.  *Id.*  Misinterpretation or misapplication of the law is an abuse of discretion.  *State v. Bartch,* 28 Wn. App. 2d. 564, 573, 537 P.3d 1091 (2023), *review denied*, 2 Wn.3d 1026 (2024).  ER 404(b) establishes limits on the admissibility of other act evidence as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Prior to the admission of such evidence, the judge must conduct the following additional four-step analysis on the record:

> the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the

evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

*State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). If the decision to admit the evidence was in error, we then apply the nonconstitutional harmless standard of review and consider if it is reasonably probable that "the outcome of the trial would have been materially affected had the error not occurred." *State v. Slocum*, 183 Wn. App. 438, 456, 333 P.3d 541 (2014). "[W]e can affirm the trial court's ruling on any grounds the record and the law support." *State v. Grier*, 168 Wn. App. 635, 644, 278 P.3d 225 (2012).

### A. Misapplication of Controlling Test

In its initial offer of the prior incident, the State relied on a statement of the law from *State v. Kilgore*, 147 Wn.2d 288, 53 P.3d 974 (2002).

> [T]he trial court must (1) find by a preponderance of the evidence that the uncharged acts probably occurred before admitting the evidence, (2) identify the purpose for which the evidence will be admitted, (3) *find the evidence materially relevant to that purpose*, and (4) balance the probative value of the evidence against any unfair prejudicial effect the evidence may have upon the fact-finder.

*Id*. at 292 (emphasis added). A review of related opinions both before and after *Kilgore* shows that this particular statement of the law is out of sync with the overwhelming majority of case law analyzing the test for ER 404(b). The excerpt from *Kilgore* quoted by the State relies on, but does not quote, *State v. Pirtle*, 127 Wn.2d 628, 904 P.2d 245 (1995). In *Pirtle*, this point of law is phrased differently, and states,

> [T]he trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the

- 6 -

evidence is sought to be introduced, (3) *determine whether the evidence is relevant to prove an element of the crime charged*, and (4) weigh the probative value of the evidence against its prejudicial effect.

*Id.* at 649 (emphasis added); *see also Arredondo*, 188 Wn.2d at 257; *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012). Our Supreme Court has further determined that the third step in the admissibility analysis may also be satisfied if the evidence is relevant to rebut the defense. *State v. Lough*, 125 Wn.2d 847, 852, 889 P.2d 487 (1995); *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Careful review of the body of case law regarding ER 404(b) establishes that the wording of the third step of the analysis as set out in *Kilgore* is very likely inartful paraphrasing of the test in *Pirtle* and, to the extent that it constitutes a distinct holding, an anomaly that has not been repeated in subsequent Supreme Court cases. Gebremariam's opposition to the State's attempt at admission was attentive to the difference between the statement of the law in *Kilgore* compared to our other precedent, and further noted that the "prior bad act at QFC has no relevance to any elements of the indecent liberties as alleged here. The State does not argue that it does."

The trial court relied on this statement from *Kilgore* in its findings of fact and conclusions of law and stated that "the identified purpose for which this evidence is offered is to show preparation, opportunity, and/or acting pursuant to a plan." The court further stated that a "reasonable jurist could find that this was grooming behavior, and it is thus highly relevant."[5] It is unclear if this was a reference to the

---

[5] Separately, "grooming behavior" has been addressed in cases involving sexual abuse of minors, but the trial court did not cite any authority that has extended that unique basis to adults

standard of review on appeal or the judge misspoke in referencing jurors sitting in their capacity as finders of fact. No mention was made of the elements of indecent liberties;

> A person is guilty of indecent liberties when [they] knowingly cause[] another person to have sexual contact with [them] or another:
> . . . .
> (c) When the victim is a person with a developmental disability and the perpetrator is a person who:
> (ii) Was providing transportation, within the course of [their] employment, to the victim at the time of the offense.

RCW 9A.44.100(1). The trial judge did not properly link the prior incident to the elements of the offense and was misguided in his reliance on the inconsistent statement of the law in *Kilgore*. Misapplication of the controlling law is an abuse of discretion.

### B.  Harmless Error

We now analyze whether the admission of the other act evidence on this improper basis was harmless; that is, if the outcome of the trial was materially affected by the admission. *Slocum*, 183 Wn. App. at 456. An erroneous ruling on admissibility is harmless if there was an alternative basis that would be proper. *State v. Sublett*, 156 Wn. App. 160, 196, 231 P.3d 231 (2010), *aff'd*, 176 Wn.2d 58, 292 P.3d 715 (2012).

The State's motion offered the other act evidence for the purpose of establishing a common scheme or plan, opportunity, and preparation as anticipated by the plain language of the rule, to rebut a defense that may seek to

---

with cognitive or developmental disabilities. The State similarly failed to identify any such authority in the trial court or on appeal. We decline to so extend that particular line of jurisprudence here.

impeach K.T.'s credibility, and as res gestae. Distinct from ER 404(b), res gestae allows for the admission of evidence "that completes the story of the crime charged or provides immediate context for events close in both time and place." *State v. Sullivan*, 18 Wn. App. 2d 225, 237, 491 P.3d 176 (2021). The evidence must still satisfy relevance and thus must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." ER 401.

Evidence of the prior interaction could have properly been admitted as res gestae or in response to defense attempts to impeach K.T. The prior incident of game playing and uninvited touching was directly relevant to the charged conduct and its admission aided in rebutting the defense premised on credibility determinations. The other act evidence tended to show that Gebremariam may have taken steps to determine K.T.'s level of cognitive development by seeing how she responded to isolation, playing a children's game, and communication involving sexual innuendo. It further suggested that Gebremariam tested how K.T. would react to uninvited physical contact that later escalated to uninvited sexual contact. While the two events were separated by a month, this fact is not independently dispositive; res gestae can be used "'to complete the story of a crime or to provide immediate context.'" *State v. Dillon*, 12 Wn. App. 2d 133, 148, 456 P.3d 1199 (2020) (emphasis added) (quoting *State v. Lillard*, 122 Wn. App. 422, 432, 93 P.3d 969 (2004). This is so because the two situations have compelling connections, the same victim, in the same circumstances, in the same place, and the evidence completes the story because it rebuts a material assertion

made by Gebremariam, that he had not encountered K.T. before the charged incident. *See id.* Further, K.T.'s testimony was that she included information about the first incident when she wrote notes about the incident on January 6. Evidence about that earlier incident was thus connected to her narrative about the charged crime, but also the duration and scope of her relationship with Gebremariam. Put simply, the other act evidence completed the story of the charged crime.

Finally, this evidence could have been properly admitted in the context of impeachment. Gebremariam's defense was denial and undermining K.T. and R.'s credibility based on the filing of the civil suit; effectively a credibility contest. The State argued the other act evidence was relevant to establish K.T.'s credibility, but the evidence could also have been admitted to impeach Gebremariam. During the investigation, Gebremariam told both his employer and Garrison that he had driven K.T. in the Access van prior to the January 6 incident, but at trial he stated that he had never met her before January 6. K.T.'s testimony about the earlier peekaboo incident would have been admissible to impeach his testimony in that regard. Thus, because evidence of the prior incident was admissible as res gestae and impeachment evidence, any error resulting from the trial court's misapplication of the test for admissibility was harmless.[6]

II.    Community Custody Condition

The trial judge imposed a community custody condition at sentencing that, among other things, establishes that "[s]exual contact in a relationship is prohibited

---

[6] This conclusion is bolstered by the fact that the trial court granted the defense request for a limiting instruction on this evidence. This instruction was given orally during K.T.'s testimony and as part of the written instructions provided to the jury prior to deliberation.

until the treatment provider approves of such." Gebremariam avers that this condition is overly broad and an unconstitutional burden on his fundamental right to marital contact with his wife. He requests remand for the trial court to amend this community custody condition to allow sexual contact with his wife without prior approval. The State, without conceding as to the constitutional propriety of the condition, does not oppose a remand to add an exception allowing Gebremariam to engage in sexual contact with his wife without prior approval. Accordingly, we remand for the trial court to amend the challenged condition consistent with this opinion.

III.     Legal Financial Obligations

Finally, Gebremariam seeks remand to strike the VPA and DNA fee consistent with amendments to the relevant law and the trial court's finding that he is indigent. The State concedes that remand on this basis is appropriate. We agree that the amendments apply to Gebremariam, accept the State's concession, and remand to the trial court to strike these legal financial obligations (LFOs).

We affirm in part, reverse in part, and remand for the trial court to strike the LFOs and amend the community custody condition.

I CONCUR:

- 11 -

**State v. Gebremariam, No. 85179-9-I**

FELDMAN, J. (concurring) – I concur in the majority's well-reasoned opinion except with respect to its criticism of *State v. Kilgore*, 147 Wn.2d 288, 53 P.3d 974 (2002). Because any error applying the four-part test for admission of other acts evidence was harmless, as the majority correctly concludes, I concur in affirming Gebremariam's conviction.

Feldman, J.